

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

**RICKEY ROBINSON-EL**

_____

_____

(Enter above the full name
of the plaintiff or plaintiffs in
this action)

RECEIVED
MAR 13 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

RECEIVED
APR 22 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

vs.

Case No: **07 C 6412**
(To be supplied by the Clerk of this Court)

**CHARLES PETERSON**
**GEORGE ADAMSON**
**TAMMY GARCIA**
**AMI WORKMAN**
**TERRY L. McCANN**
**JANE BULARZIK**

**Melody J. Ford**
**ROGER E. WALKER JR**
**ROD BLAGOJEVICH**

RECEIVED
APR 22 2008
MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT
Apr 22, 2008

(Enter above the full name of ALL
defendants in this action. Do not
use "et al.")

**CHECK ONE ONLY:**   FOURTH   **AMENDED COMPLAINT**

✓   **COMPLAINT UNDER THE CIVIL RIGHTS ACT, TITLE 42 SECTION 1983
    U.S. Code** (state, county, or municipal defendants)

_____   **COMPLAINT UNDER THE CONSTITUTION ("BIVENS" ACTION), TITLE
    28 SECTION 1331 U.S. Code** (federal defendants)

_____   **OTHER** (cite statute, if known)

_BEFORE FILLING OUT THIS COMPLAINT, PLEASE REFER TO "INSTRUCTIONS FOR
FILING." FOLLOW THESE INSTRUCTIONS CAREFULLY._

I. **Plaintiff(s):**

A. Name: _Rickey Robinson-El_

B. List all aliases: _-0-_

C. Prisoner identification number: _K-82958_

D. Place of present confinement: _Stateville Correctional Center_

E. Address: _Route 53, P.O. Box 112, Joliet, Illinois [60434]_

(If there is more than one plaintiff, then each plaintiff must list his or her name, aliases, I.D. number, place of confinement, and current address according to the above format on a separate sheet of paper.)

II. **Defendant(s):**
(In **A** below, place the full name of the first defendant in the first blank, his or her official position in the second blank, and his or her place of employment in the third blank. Space for two additional defendants is provided in **B** and **C**.)

A. Defendant: _Charles Peterson_

Title: _Stateville Chaplain_

Place of Employment: _Stateville Correctional Center_

B. Defendant: _George Adamson_

Title: _Senior Chaplain_

Place of Employment: _Stateville Correctional Center_

C. Defendant: _Tammy Garcia_

Title: _Grievance Officer_

Place of Employment: _Stateville Correctional Center_

(If you have more than three defendants, then all additional defendants must be listed according to the above format on a separate sheet of paper.)

Revised 9/2007

D.  Defendant:  AMI WORKMAN

    Title:  GRIEVANCE OFFICER

    Place of Employment:  STATEVILLE CORRECTIONAL CENTER

E.  Defendant:  TERRY L. McCANN

    Title:  WARDEN/CHIEF ADMINISTRATIVE OFFICER

    Place of Employment:  STATEVILLE CORRECTIONAL CENTER

F.  Defendant:  JANE BULARZIK

    Title:  IDOC LEGAL COUNSEL

    Place of Employment:  ILLINOIS DEPARTMENT OF CORRECTIONS

G.  Defendant:  MELODY J. FORD

    Title:  ADMINISTRATIVE REVIEW BOARD

    Place of Employment:  ILLINOIS DEPARTMENT OF CORRECTIONS

H.  Defendant:  ROGER E. WALKER JR

    Title:  DIRECTOR

    Place of Employment:  ILLINOIS DEPARTMENT OF CORRECTIONS

I.  Defendant:  ROD BLAGOJEVICH

    Title:  GOVERNOR

    Place of Employment:  STATE OF ILLINOIS

**III.**     **List ALL lawsuits you (and your co-plaintiffs, if any) have filed in any state or federal court in the United States:**

    A.    Name of case and docket number: _____

          _____

    B.    Approximate date of filing lawsuit: _____

    C.    List all plaintiffs (if you had co-plaintiffs), including any aliases: _____

          _____

          _____

    D.    List all defendants: _____

          _____

          _____

    E.    Court in which the lawsuit was filed (if federal court, name the district; if state court, name the county): _____

    F.    Name of judge to whom case was assigned: _____

    G.    Basic claim made:_____

          _____

    H.    Disposition of this case (for example: Was the case dismissed? Was it appealed? Is it still pending?): _____

          _____

    I.    Approximate date of disposition: _____

**IF YOU HAVE FILED MORE THAN ONE LAWSUIT, THEN YOU MUST DESCRIBE THE ADDITIONAL LAWSUITS ON ANOTHER PIECE OF PAPER, USING THIS SAME FORMAT. REGARDLESS OF HOW MANY CASES YOU HAVE PREVIOUSLY FILED, YOU WILL NOT BE EXCUSED FROM FILLING OUT THIS SECTION COMPLETELY, AND FAILURE TO DO SO MAY RESULT IN DISMISSAL OF YOUR CASE. CO-PLAINTIFFS MUST ALSO LIST ALL CASES THEY HAVE FILED.**

Revised 9/2007

**IV.    Statement of Claim:**

State here as briefly as possible the facts of your case.  Describe how each defendant is involved, including names, dates, and places. **Do not give any legal arguments or cite any cases or statutes.** If you intend to allege a number of related claims, number and set forth each claim in a separate paragraph.  (Use as much space as you need.  Attach extra sheets if necessary.)

This action is brought against the State of Illinois and against certain **IDOC Prison Employees** of the State of Illinois, so named in this Second Amended Complaint, for "discrimination supported by state action" enforced by State officials and employees "under color of State law". A district court may substitute a department/agency [IDOC] in place of the Defendant State of Illinois because the Illinois Department of Corrections may be sued in its own name in a United States district court.

COUNT I. CAUSE OF ACTION
Plaintiff's Establishment Clause Claim
1. As a Washitaw Ismaili Moslem Plaintiff was/is compelled to attend "religious services" of non-Indigenous [non-Indian] Muslim groups pursuant to Warden's Bulletin No. 2007-109 and the notarized letter provided by Defendant George

4                                          Revised 9/2007

Adamson, herein attached as Exhibits E-3 & E-7. This type of coercion violates the "establishment clause." This "religious coercion" practiced by the IDOC, under the **Challenged Policy** i.e. Warden's Bulletin No. 2007-109, is prohibited under the **establishment clause**, which serves to protect "religious choice" against government coercion. Whether direct or indirect, IDOC's "coercion of religious conformity" is a Violation of the establishment clause; and the mandatory attendance, required by Washitaw Muurs under the **Challenged Policy**, at another's "religious services" and "religious instructions" violated the establishment clause.

  2. Defendant Jane Bularzik's opinion rendered November 6, 2006 violated the Establishment Clause denying plaintiff the right to Religious/Indigenous Identification via failure to allow Plaintiff's photograph with religious headdress; the **Red Fez**, herein attached as Exhibit D-1.

Revised 9/2007

3. Defendant Tammy Garcia also violated the Establishment Clause on November 17,2006 when she denied plaintiff's grievance to exercise his right to Religious/Indigenous Identification tohave a photograph with religious headdress, herein attached as Exhibit D-4.

4. Defendant Terry L. McCann further violated the Establishment Clause on November 28,2006 when he concurred with defendant Tammy Garcia's denial of plaintiff's grievance to exercise his right to Religious/Indigenous Identification in violation of the Establishment Clause, herein attached as exhibit D-4.

5. Defendant's Melody J. Ford & Roger E. Walker Jr subsequently denied plaintiff's grievance to exercise his right to Religious/Indigenous Identification in violation of the Establishment Clause, herein attached as exhibit D-5.

6. Defendant George Adamson violated the Establishment Clause when he subsequently denied plaintiffs rights to practice Ismaili Islam on June 14, 2007 - August 7,2007 and November 6,2007, and practice in Ramadan on November 6,2006, herein attached as exhibit C-2, C-1, A & E-1.

7. Defendant Terry L. McCann violated the Establishment Clause when he subsequently denied plaintiffs rights to practice Ismaili Islam on June 6,2006 and August 13,2007, to practice in Ramadan on November 28,2006 and September 6, 2007, and to observe the tenets of Ismaili Islam not limited to the wearing of the traditional Indigenous headdress "**dredlocks**" on September 13,2006, herein attached as exhibits C-2, C-4, E-5, B-5 & E-7.

### COUNT II. CAUSE OF ACTION
### Plaintiffs Conspiracy Claim

Plaintiff asserts that **IDOC Director** and **Supervisory** and prison **Officials,** "conspired" to violate the Plaintiff's "federally protected rights" guaranteed under the United States Constitution. The Defendants failed to establish minimum standards for inclusion for all religious groups who desire to have "religious services" and practice their traditional religion, particularly prison inmates who are members of the **Indigenous Washitaw Nation of Muurs,** who practice their religion under the **Moorish Science Temple of America.** The purpose for this **"conspiracy"** was to deprive prison inmates who were **Washitaw Muurs,** who are members of the **Washitaw Nation of Muurs,** of their "federally protected rights" guaranteed under the United States Constitution. The **"conspiracy"** consisted of the deprivation of the **"free exercise of religion"** and the **"equal protection of the laws"** rights.

6

Each Defendant conspired among themselves to deprive the **Plaintiff** of his rights. The Conspirators committed acts in furtherance of the **conspiracy** which included: **1.)** the denial of an **"administrative hearing"** pertaining to **"religious services;" 2.)** the continuous denial of **"religious services;" 3.) IDOC** failure to allow the wearing of the traditional indigenous headdress: **"dreadlocks"** & **"Red Fez."**

1. On September 7,2006 Defendant Ami Workman denied Plaintiff's grievance submitted August 17,2006. Plaintiff's grievance challenged the Individual Grooming Policy asserting that as an Indigenous individual the wearing of his dreadlocks is apart of the traditional indigenous headdress and that he seeks a religious exception to the policy that his rights may be upheld, herein attached as exhibit B-3.

2. September 13,2006 Defendant Terry L. McCann concurred with defendant Ami Workman's denial of Plaintiff's grievance. Plaintiff appealed this grievance to the Director September 15,2006, herein attached as exhibit B-3.

3. January 2,2007 Defendants Melody J. Ford & Roger E. Walker Jr denied Plaintiff's grievance without a administrative hearing, herein attached as exhibit B-4.

4. September 21,2006 Plaintiff made a final attempt to gain a religious exception to the groomong policy by submitting a letter directly to defendant Roger E. Walker Jr that he subsequently denied again January 25, 2007, herein attached as exhibit B-5 thru B-8.

5. November 6,2006 Defendant Jane Bularzik conspired via her legal opinion to deny plaintiff's grievance submitted August 18,2006. Plaintiff's grievance requested to have his photograph taken with his **Red Fez** (sacred headdress) to complete his enrollment on a national level, herein attached as exhibits D-1 thru D-3.

6. On november 17,2006 Defendant Tammy Garcia furthered the conspiracy when she denied the plaintiff's grievance based on Jane Bularzik's legal opinion, herein attached as exhibit D-4.

7. On November 28,2006 Defendant Terry L. McCann concurred with Tammy Garcia's denial of Plaintiff's grievance in furtherance of the conspiracy,herein attached as exhibit D-4. December 12,2006 plaintiff appealed to the director.

8. March 14,2007 the conspiracy continued as defendant Melody J. Ford denied plaintiff's grievance without an administrative hearing, herein attached as exhibit D-5.

9. March 14,2007 in furtherance of this conspiracy defendant Roger E. Walker Jr concurred with Melody J. Ford's denial of plaintiff's grievance, herein attached as exhibit D-5.

10. October 27,2006 plaintiff filed a grievance requesting monetary damages for the effects he suffered due to being denied to Ramadan, herein attached as exhibit E-1 & E-2.

11. November 6,2006 Defendant George Adamson took part in the conspiracy to deprive plaintiff his right to Ramadan when he responded to plaintiff's grievance attaching a ten year old letter by a Clifford Warner Bey whom do not belong to plaintiff's Temple, herein attached as exhibit E-1 & E-3.

12. November 8,2006 plaintiff appealed his grievance to the grievance officer attaching his written response briefly explaining that whom they recognize as an authority for the "MSTA" is not a part of the Temple whom plaintiff gets his authority, herein attached as exhibit E-4.

13. November 17,2006 defendant Tammy Garcia furthered the conspiracy when she denied plaintiff's grievance based on defendant George Adamson's review, herein attached as exhibit E-5.

14. November 28, 2006 defendant Terry L. McCann concurred with Tammy Garcia's denial of plaintiff's grievance takeing part in the conspiracy, herein attached as exhibit E-5.

15. March 14,2007 the conspiracy again continued on as defendant Melody J. Ford denied plaintiff's grievance without an administrative hearing, herein attached as exhibit E-6.

16. March 14,2007 once again defendant Roger E. Walker Jr took his place in the conspiracy by concurring with Melody J. Ford's denial of plaintiff's grievance herein attached as exhibit E-6.

17. Plaintiff again suffered mentally & physically during the month of Ramadan 2007 as he received Warden's Bulletin No. 2007-109 denying him the right to take part, herein attached as exhibit's E-7 thru E-9.

8

18. Defendant Charles Peterson took part in the conspiracy to deny plain-tiff's efforts to Ramadan when he inserted that the Moors/Muurs do not Ramadan to a visiting Imam at Jumah service prior to the month of Ramadan 2006. Which foiled plaintiff's efforts to have the Imam accomodate the Moors who wished to Ramadan, herein attached as exhibit E-1 & E-8.

19. June 14,2007 plaintiff made one last effort to request to Warden Terry L. McCann and Senior Chaplain George Adamson for recognition of Ismaili Islam and for meeting space and time with a five page detailed letter, herein attached as exhibit C-2.

20. July 11,2007 plaintiff grieved the defendants Terry L. McCann & George Adamson's silence of plaintiffs letter of recognition, herein attached as exhibit C-1.

21. August 7,2007 defendant George Adamson took part in the conspiracy to continue to deny recognition of plaintiffs religion when he reiterated the administrative directive asking for information he already had having been in contact with plaintiffs National Leader Brother "Ravanna Sanders Bey" in the past, herein attached as exhibit C-1 and C-3.

22. August 8,2007 defendant Ami Workman took part in this conspiracy to deny recognition of plaintiffs religion when she concurred with defendant George Adamson and down played plaintiff's grievance deeming it resolved.

23. November 6,2007 plaintiff prepared a formal letter addressing defendant Geoge Adamson's request for information pertaining to the Administrative Directive. Plaintiff addressed all five requirements and attached a host of information that plaintiff knew the defendant Adamson already received from "Ravanna Bey", herein attached as exhibit's A thru A-24.

## COUNT III. CAUSE OF ACTION
### Plaintiff's Federal Equal Protection and Free Exercise Claims

The "equal protection of the laws" clause was violated when their was "no accomodation" for religious service. Plaintiff was denied access to religious materials; and was/is not allowed to wear his traditional indigenous/religious garments, sacred medallions or prayer beads. Such an attire was/is regarded as an intricate part of the Ismaili Islamic Faith. Most more, plaintiff was not allowed to participate in the sacred yearly ceremonies, particularly Ramadan. No Musilm group may claim dominion over the **"religious observance"** of **Ramadan.**

1. Defendant George Adamson failed to respond to plaintiff's request for recognition, space and time thereby failing to make any accomodation for Ismaili Islam religious service, which violated the equal protection of the laws and free exercise thereof, herein attached as exhibit's A & C-2.

2. Defendant Roger E Walker Jr failed to offer any accomodation for Ismaili Islam religious service which violated the equal protection of the laws clause and free exercise thereof, herein attached as exhibit A-1.

3. Defendant Rod Blagojevich also failed to offer any accomodation for Ismaili Islam religious service which violated the equal protection of the laws clause and free exercise thereof, herein attached as exhibit A-1.

4. Defendant Ami Workman denied plaintiff's equal protection of the laws and free exercise thereof September 7,2006 when she denied plaintiff grievance stating dreadlocks are not permitted regardless of sex, **religion**, race or **ethnicity**, herein attached as exhibit B-3.

5. Defendant Terry L. McCann denied plaintiff's equal protection of the laws and free exercise thereof september 13,2006 when he concurred with defendant Ami Workman's denial of plaintiff's grievance to allow the wearing of his traditional headdress "dreadlocks", herein attached as exhibit B-3.

6. Defendant's Melody J. Ford & Roger E. Walker Jr subsequently denied plaintiff's equal protection of the laws and free exercise thereof January 2, 2007 & January 25,2007 when they denied plaintiff's grievance and concurred with defendant Ami Workman that "dreadlocks", plaintiff's traditional headdress, are not permitted regardless of religion, herein attached as exhibit B-4 & B-8.

7. November 6,2006 Defendant George Adamson produced a ten year old letter to deny plaintiff, a member of the Ismaili Islamic Faith, the right to participate in the sacred yearly fast, Ramadan, which violated the plaintiff's "equal protection of the laws" and free exercise thereof, herein attached as exhibits E-1 & E-3.

8. November 17,2006 Defendant Tammy Garcia denied plaintiff's right to ramadan when she denied his grievance based on defendant George Adamson authority, which also violated the plaintiff's equal protection of the laws and free exercise thereof, herein attached as exhibit E-5.

9. November 28,2006 defendant Terry L. McCann concurred with defendant Tammy Garcia's denial of plaintiff's right to ramadan that violated the plaintiff's equal protection of the laws and free exercise thereof, herein attaced as exhibit E-5.

10. Defendant's Melody J. Ford and Roger E. Walker Jr subsequently denied plaintiff's equal protection of the laws and free exercise thereof March 14, 2007 when they denied plaintiffs grievance and concurred with defendant Tammy Garcia's denial of plaintiff's right to ramadan, herein attached as exhit E-6.

11. September 6,2007 defendant Terry L. McCann circulated his bulletin denying plaintiff equal protection of the laws and free exercise thereof that restricted plaintiff from participating in Ramadan, herein attached as exhibit E-7.

## COUNT IV. CAUSE OF ACTION
### Plaintiff's Claim Of Discrimination Based On Nationality And Religion

Plaintiff alleges that he was discriminated against because of his "national origin" ("nationality") and "religion;" and because Illinois is required to acknowledge plaintiff's "religion" because the Moorish Science Temple of America is recognized by Illinois.

1. Plaintiff points out that Indigenous Washitaw Nation of Muurs practice their religion under the Moorish Science Temple of America via the Reincarnate Temple whose faith is also known as Ismaili Islam in which IDOC fails to recognize, herein attached as exhibit's A-1, C-2, F-1, F-2, F-3, F-4, F-6, G-1, G-3, & G-6.

2. Defendant George Adamson and other defendants named throughout this complaint who are State Employees of IDOC discriminated against plaintiff's nationality and religion when he produced a ten year old letter that states: "The recognized authority concerning MSTA is Clifford Warner Bey, both by the Department of Corrections and by the MSTA." Whereas Clifford Warner Bey is not a recognized member of the Reincarnate Temple/Washitaw Ismaili Islam. The recognized authority of the reincarnate Temple is "Ravanna Sanders Bey" whom the Department of Corrections refuses to acknowledge, thus denying plaintiffs nationality and religion, herein attached as exhibits E-3 & F-6.

11

3. Plaintiff asserts that his Nationality and Religion as a Washitaw Muur is registered with the **State of Illinois** herein attached as exhibits F-7 thru F-14. It is the **State** itself that creates the power of the "actor" (**IDOC Employees**) in the name of the department (**IDOC**). When the **State** department (**IDOC**) fails to open a "religious forum" to a particular religious group and inmate adherents, the absence of such forum constitute discrimination toward that/those particular "religion(s)" and/or "nationality." Civil laws are held to apply to the **State actions** of departments from the **State's** "delegation of authority."

### Standard Of Review

On several occasions both the **Warden** and **Chaplain** at State-ville were given "**requests**" for "**religious service;**" and on every occasion, the **Plaintiff** was directed to attend "**religious services**" of a "**non-Indigenous**" Muslim group in violation of the "**Establishment Clause.**" For over a period of ten (10) years, "**requests**" were denied; and inmates who are **Washitaw Muurs** were denied the privileges that were granted to other religious groups. Attendance for "**religious services**" were denied, but were affirmed for other religious groups. Because IDOC employees failed to act to prevent the "**deprivation,**" their actions contributed to the violation of **Plaintiff's** rights.

### Summary Argument

**Plaintiff Motions** for **Injunctive, Equitable** and **Declaratory Relief** should be granted because Plaintiff has suffered, and continues to suffer irreparable injury from defendants act's and omissions, under the misguided policies and practices of the Illinois Department of Corrections. The grounds for granting **Plaintiff's Motions** and Prayer for Relief are predicated on the fact that **Plaintiff** have been deprived of federally protected rights: 1.) "**free exercise of religion,**" 2.) "**equal protection of the laws**" and 3.) "**establishment clause.**"

### Prayer For Relief

**Plaintiff** prays that the Court enters a Judgment against the **Defendants** for **Injunctive Relief,** requiring the **Illinois Department of Corrections** (IDOC) to accommodate **Plaintiff's** religion; requiring the IDOC to permit the **Washitaw Muurs** to have "**religious services;**" requiring the IDOC to permit the **Washitaw Muurs** the wearing of their traditional indigenous headdress: "**dreadlocks;**"

requiring the **IDOC** to permit the **Washitaw Muurs** a photograph with the religious
headdress: the **Red Fez** as required by the U.S. State Department, Departments of
Homeland Security and of the Interior, Bureau of Indian Affairs; requiring the
**IDOC** to allow the **Washitaw Muurs** participation in ramadan; and requiring
United States District Court to compel the performance of **Illinois Department
of Corrections** to act in accordance with **Illinois State** law and **United States**
statutes.

    **Plaintiff** prays that the Court enters an **ORDER** of Judgement against the
Defendants for **Actual/Compensatory Damages** in the amount of $100,000.00 per
Defendant, or in an amount sufficient to fully compensate the **Plaintiff** for
injuries, damages plaintiff suffered both mentally & physically that incurred
during the 2006 & 2007 periods of Ramadan at the expense of Plaintiffs
**"national origin"/"nationality"** and **"religion."**

    **Plaintiff** prays that the Court enter an **ORDER** of Judgment against the
Defendants for **Punitive/Exemplary Damages** in the amount of $100,000.00 per
Defendant, or in an amount sufficient to adequately punish Defendants for their
actions and omissions at the expense of Plaintiffs **"national origin"/"nationality"**
and **"religion."**

    **Plaintiff** prays that the Court enters an **ORDER** of Judgment against the
Defendants for the cost of litigation and court fees, for legal counsel and
attorneys fees, for indemnity bonds (subrogation/indemnification), and/or for
any other relief the Court may deem appropriate, just and proper.

**V.    Relief:**

State briefly exactly what you want the court to do for you.  Make no legal arguments.  Cite no cases or statutes.

*See Previous Page Attached!*

**VI.**    The plaintiff demands that the case be tried by a jury.    ☑ YES    ☐ NO

## CERTIFICATION

By signing this Complaint, I certify that the facts stated in this Complaint are true to the best of my knowledge, information and belief.  I understand that if this certification is not correct, I may be subject to sanctions by the Court.

Signed this **6**<sup>th</sup> day of *March*, 20**08**

*Rickey Robinson-El ©*
(Signature of plaintiff or plaintiffs)

*Rickey Robinson- El ©*
(Print name)

*# K-82958*
(I.D. Number)

*Rt. 53, P.O. Box 112*
*Joliet, Illinois [60434]*
(Address)

6                                                    Revised 9/2007

Rickey Robinson-El
#K82958
B-227

*Exhibit A*

November 6, 2007

Chaplain Adamson,

I have finally received the documentation that you request is required, and I am formally addressing your request regarding section 425.60.

1.) Written verification that other committed persons belong to that faith and are interested in attending such religious activities.

"The MUURS under the 1926 charter are representatives of the original Moorish Science Temple of America; we are not a splinter group of MUURS as claimed by members of your chaplainry. We are the authentic MUURS, born of the organic Washitaw Nation of Muurs. Therefore all members of the Moorish Science Temple regardless of the faction of which they have been taught are MUURS, thus I am a sheik/Teacher to propogate this fact to all Muurs. (See Exhibits A-1, A-2, & A-3)"

2.) The names, addresses, and telephone numbers of the outside leaders of the faith.

"
Though this administration has been in correspondence with Ravanna Pey in the past: His name & address can be obtained in the upper right hand corner of exhibit A-1, and on the bottom of exhibit A-2."

3.) Copies of the by-laws, chapters, or articles of incorporation, to the extent available.

"Most if not all are the same as has been provided by the Moorish Science Temple in the past. You can confirm & clarify by contacting Ravanna Pey."

4.) Written verification of the religion's practices, requirements, historical origins, size of membership population, organization hierarchy and structure, role of religious personnel, and dietary restrictions.

"To this effect I basically laid it all out to you and McCann in my 5 page requesat for recognition/space and time. I am enclosing more information, any more that is needed you should contact Ravanna Pey. (See Exhibits A-1 thru 21 as well as the 8 pages of Application of for recognition of exemption)"

5.) The time place and nature of any religious activities to be conducted and the identity of the religious program volunteer who will conduct the requested religious activities as well as their address, telephone number, and credentials; and

"Again the time, place and nature that has not been provided in my five page Request for Recognition can be worked out with clarity should you contact Ravanna Pey. What is for certain, having to have a religious volunteer is where we bump heads with the policy, whereas we are willing to allow a chaplain to sit in while we conduct our services according to the confirmation of Ravanna Pey.

Exhibit A-1)

Wednesday May 30, 2006

TO: Roger E. Walker, Director
Illinois Department of Corrections
P.O. Box 19277
Springfield, Illinois 62794-9277

Rod Blagojevich, Governor
C/o Illinois Dept. of Corrections
207 Statehouse
Springfield, Illinois 62706-0000

Lisa Madigan
Illinois Attorney General
500 South Second Street
Springfield, Illinois 62706

FROM: Ravanna Sanders–Bey
Moorish Science Temple
U.S.A. P.O. Box 0318
Chicago, Illinois 60621

**Re: Request for Meeting Space for the Moorish Science Temple of America**
Ismaili Islam, Reincarnate Temple of Chicago
Washitaw Nation of Muurs

Incorporated in the State of Illinois in 1926, this Temple is the oldest and original Moorish Science Temple. This Temple is the only Temple registered with the United States government [EIN: 56-2473981]: Interior, Commerce, Justice and State Departments. It is a Religious Corporation registered with the Secretary of State, State of Illinois [Tax Exemption No.: E 9939-0647-1, Illinois Department of Revenue]. The Moorish Science Temple of America is the "religious" component of the Washitaw Nation of Muurs; an Indigenous Nation first Acknowledged by Spain in 1797 and then by the United States in 1802 [U.S. Land Grant 923]. The Nation's religious status is protected under Article III of the Louisiana Cession Treaty [8 Stat. 200 (1803)]. IRS: Exception 17053-290-74400-4 [Certified Mail 7003 3110 0000 4219 7846] Illinois Tax Exemption E 9939-0647-01.





| PROTESTANTISM | CATHOLICISM | CONFUCIANISM | BUDDHISM | HINDUISM | JUDAISM | ISLAM | ZOROASTRIANISM |
|---|---|---|---|---|---|---|---|
| **Lutheran** | Eastern Orthodox | Daoism/Taoism | Tibetan | India/Hindu | Orthodox | Sunni | Persia/Iranian National |
| **Anabaptist** | Roman Catholic | | Japanese | | Talmudic | Shi'a | Shiite Islam Twelve's |
| **Mennonite** | Anglican Catholic | | | | Falashas | Ismaili=Severer's | |
| **Amish** | Byzantine Catholic | | | | Reform | Sufi | |
| **Calvinist** | Greek Orthodox | | | | Conservative | Baba'i/Babism | |
| **Presbyterian** | Russian Orthodox | | | | Traditional | Ahmadiyyat | |
| **Reformed** | Romanian Orthodox | | | | Lubavitch Chabad | Sikhism/Sikhs | |
| **Anglican** | Ukrainian Orthodox | | | | | | |
| **Puritan** | Armenian Apostolic | | | | | | |
| **Methodist** | Seventh Day Adventist | | | | | | |
| **Episcopal** | Jehovah Witnesses | | | | | | |
| **Baptist** | Pentecostal | | | | | | |
| **Quakers** | African Episcopal Methodist [AME] | | | | | | |



All Christians, Protestants and Catholics are Not the same; and likewise, all Jews and Moslems are Not alike. **Ismaili Islam**, the sacred way of like of the Muurs, is Not the same as Sunni or Shiite Islam. The world view of one is Not one and the same as the other. Sunni is Not Shiite, and **Ismaili** is Not Sunni nor Shiite. Note the conflict [war] between Iraq and Iran [1979-1989], and the Civil War between Sunni and Shiite in Iraq today. Therefore, if their are several groups of Muurs [as their maybe Arabs, Turks, Persians, or Afghani], it follows that one group may not practice the same form of Islam as the other. In fact this is the case. **It is our request that** Ismaili Islamic adherents are allowed to meet among themselves and practice their own form of Islam. All Muurs do Not practice the same form of Islam. Ismaili, also known as "Severer's," is Moorish Islam.

The Muurs under the 1926 Charter are representatives of the original Moorish Science **Temple of America**, for we are Not a "Spinter Group" of Muurs as claimed by members of your Chaplaincy. We are the Authentic Muurs, born of the organic Washitaw Nation of Muurs. We would be grateful and most applicative if the Illinois Department of Corrections would grant our Temple space to have our religious service and study meetings.

**SUBSCRIBED, SEALED AND AFFIRMED**

In Witness whereof, I have hereunto set my hand and caused the Seal of the Moorish Science Temple of America to be affixed, this 30th Day of May in the Year 2006.

Witness The Hand And Seal

Sheik Ravanna Sanders-Bey: Moorish Science Temple of America







(Exhibit A-7)

# Jamal al-Din al-Afghani

| | | | |
|---|---|---|---|
| Timothy Turner-Drew Ali | [January 8th 1886–1929 July 20th] | Noble Drew Ali | Prophet and Founder |
| John Givens El | [December 6th 1904–1945 October 21st] | Noble Drew Ali | Reincarnate Prophet |
| Ira Johnson El | [June 18th 1879–1949 December 5th] | Brother Nazarene | Reincarnate Temple |
| Sister Eva Ali El | [April 11th 1912–2005 October 14th] | Queen Mother Eva | Reincarnate Temple |
| Prince Mohammed Ali El | [born March 13th 1941] | Son and Heir | Reincarnate Temple |

## MOORISH SCIENCE TEMPLE OF AMERICA
### REINCARNATE TEMPLE OF CHICAGO



1. **T. Compton Bey** [died 1934]    Teacher 1929–1934
2. **Brother Ross El** [died 1955]    Teacher 1934–1949
3. **Guy Montgomery El** [b. 1889–1977 d.]    Teacher 1949–1958
4. **Samuel Nance Bey** [died 1969]    Teacher 1958–1964
5. **William Woods El** [b. 1898–1979 d.]    Teacher 1964–1972
6. **Claudas Watson El** [b. 1939–1983 d.]    Teacher 1972–1983
7. **Prince David Ali El** [b. 1942–1996 d.]    Teacher 1983–1996
8. **Mohammed Ali El** [b. 1932–1999 d.]    Teacher 1996–1999







Ravanna Sanders Bey



Brother Noble Drew Ali Reincarnate Founder of the Moorish Science Temple of America Aug. 1914

**Thursday, July 05, 2007**

9-A  Sis Marylyn McClinton El [b. November 17, 1926]    Teacher 1999–
9-B  Sister Starlet Watson El [b. 1957-0000 d.]    Teacher Chicago
9-C  Brother Currie Watson El [b. 1971-0000 d.]    Teacher Chicago
9-D  Bro. Adel McClinton El    Teacher Chicago
9-E  Brother Emanuel El    Teacher Chicago
9-F  Bro. Jason Keith Taylor El    Teacher Statesville
9-G  Bro Aaron Pinkston El-Bey    Teacher Lawrence
9-H  Bro. Rickey Robenson–El    Teacher Statesville
10-A  Sister Orissa McClinton El    Teacher Chicago
10-B  Bro. Carman McClinton El    Teacher Chicago
—  Derrick Cabbil–Bey, Michigan Grand Sheik/Imam
—  Bakare McFarland-Bey, Illinois Grand Sheik/Imam

10-H  Johnny H. Alexander  Teacher, Chippew Kincheloe,  Michigan Republic [49784]
10-G  Alfred Earl Owens–El  Teacher, Straits Kincheloe,  Michigan Republic [49785]
10-F  Kenneth Hardin–El  Teacher, Deerfield Ionia, Michigan Republic [48846]
10-E  Richard Dyer–Bey  Teacher, Grand Mufti/Khan Standish, Michigan Republic [48658]
10-D  Derrick Cabbil–Bey Teacher, Grand Sheik / Imam Manistee, Michigan Republic [49660–9200]
10-C  Brother Joseph Garrett Bey, Chicago Teacher
—  Adel McClinton El  2nd Grand Sheik / Imam
—  El Seti Anu Ali El  Supreme Grand Khan/Amir
—  Omar S. Sanders Bey Illinois Grand Mufti/Khan
—  Richard Dyer–Bey  Michigan Grand Mufti/Khan
—  Ravanna M. S. Bey  Supreme Grand Sheik/Imam

MSTA, Inc., Reincarnate Temple System • U.S.A. P.O. Box 21318 • Chicago, Illinois Republic [pz 60621–0318]

# EMPIRE MAURETANIA AL MAGHRIB

## BIOGRAPHY

### ISMAILI ISLAM

**Nasr, Seyyed Hossen**
"Theology, Philosophy, and Spirituality." **Chapter 22.** In: <u>Islamic Spirituality</u>.
New York: Crossroad Publishing Company, **1991: Pp 395–446**

**Farhad Daftary**, Editor
<u>Ismaili in Medieval Muslim Societies: A Historical Introduction to an Islamic Community</u>.
**[Ismaili Heritage Series, Vol. 12]** Holtzbrinck Publishers,
London: I. B. Tauris and Company, **2006.**

**Yoginder Sikand**
"Shi ism . . . Indian Ismailis." In: <u>Muslim World</u>. **Vol. 93, Issue 1, 2003, Pp 99–115.**

**W. Ivanow**
"**A Forgotten Sect of the Ismailis.**" In: <u>Journal of the Royal Asiatic Society</u> **[JRAS], 1937.**
<u>Ismaili Tradition Concerning the Rise of the Fatimids.</u> London: **1942.**
<u>Brief Survey of the Evolution of Ismailism.</u> Leiden: E. J. Brill. **1952.**
<u>Studies in early Persian Ismailism.</u> 2nd Ed. Bombay. **1953.**
<u>The Alleged Founder of Ismailism.</u> 2nd Ed. Bombay. **1957.**

**Bernard Lewis**
"An Ismaili Interpretation of the Fall of Adam." In: <u>Bulletin of the School of Oriental
Studies</u> [of London]. **Vol. 9, Issue 3, 1938: Pp 691–704.**
<u>The Origins of Ismailism: A Study of the Historical Background of the Fatimid Caliphate</u>.
Cambridge, Mass.: Harvard University Press. [Reprint of the 1940 Edition], **1975.**

**A. J. Wensinck**   **Walker, Paul E.** <u>Early Philosophical Shiism: The Ismaili Neoplatonism</u>
<u>The Muslim Creed</u>.   **1993**   <u>of Abu Ya'qub al-Sijistani.</u> Cambridge University Press.

**Aurhor "Un-Named"**
"The Divine Kingship of the Aga Khan: A Study of Theocracy in East Africa" [Ismaili Islam]
In: <u>Southwestern Journal of Anthropology</u>. **Vol. 14 (Winter 1958) Issue 4, Pp 454–472.**

**David Hollenberg**
"An Early Ismaili Torah Interpretation . . . Fatimid Mission." In: <u>Religion</u>. **Vol. 33 (April
2003) Issue 2, Pp 127–145.**

**Robert J. Bocock**
"The Ismailis in Tanzania: A Weberian Analysis." In: <u>The British Journal of Sociology</u>.
**Vol. 22 (December 1971) Issue 4. Pp 365–380.**

**Nasr, Seyyed Hossein**
<u>Ismaili Contributions to Islamic Culture.</u> Tehran: **1977.**

**Stern, S. M.**   **Nasr, Seyyed Hossein**   "Kalam" Pp 231.   In:
<u>Studies in Early Ismailis.</u> Jerusalem:   **1987**   <u>Encyclopedia of Religion.</u> Vol. 8.

# THE ALLEGED DESCENT OF THE FĀTIMID CALIPHS FROM THE PROPHET MOHAMMAD



MOHAMMAD

1. 'ALĪ = FĀTIMA

**The Seven Imāms of the Ismā'ılī Shi'a**

2. Hasan      3. Hoseyn
     4. 'Alī Zeyn-el-'Ābidīn
     5. Mohammad el-Bākir
     6. G'a'far es-Ṣādik

7. ISMĀ'ĪL.      7. Mūsā el-Kazam
or 7. *Mohammad*      8. 'Alī er-Ridā

*Ismā'īl*      9. Mohammad el-G'awād

*Mohammad*      10. 'Alī el-Hādī

*Ahmad*      11. Hasan el-'Askarī

*'Abdallāh*      12. MOHAMMAD EL-MUNTAZAR

*Ahmad*

*Hoseyn*

*'Abdallāh*

**The Concealed Imāms of the Ismā'īlīs**

**The Twelve Imāms of the Imāmī Shi'a**

### FĀTIMID CALIPHS

I. El-Mahdī 909—934

II. El-Kāīm 934—946

III. El-Mansūr 945—953

IV. El-Mo'izz 953—975

V. El-'Azīz 975—996

VI. El-Hākim 996—1021

VII. Ez-Zāhir 1021—1036

VIII. El-Mustansir 1036—94

IX. El-Musta'lī 1094—1101    *Mohammad*    *El-Mustafā Nizār*

X. El-Āmir 1101—1131    XI. El-Hāfiz 1131—1149

XII. Ez-Zāfir 1149—1154

XIII. El-Fāīz 1154—1160

XIV. El-'Ādid 1160—1171

The Moorish Science Temple Of America
Reincarnate Temple Of Chicago
Washitaw Nation Of Muurs

(Exhibit A-5)



1. January 8th, 1886. Holiday of Prophet Noble Drew Ali, (1886-1929). Founder of the Canaanite Temple and later The Moorish Science Temple of America 1913 A.D. Newark, N.J.

2. January 14th, 1932. Holiday. Birthday of Brother Mohammed Ali El, (1932-1999), Moorish Spiritual Leader.

3. March 13th, 1941. Holiday. Birthday of Brother Prince Ali Mohammed El, (1941- ).

4. April 11th, 1912. Holiday. Birthday of Sister Eva Ali El, Queen Mother (1911-2005).

5. May 4th, 1927. Holiday. Birthday, Empress Verdiacee "Tiari" Washitaw-Tunica Goston El-Bey.

6. May 14th, 1925. Holy Feast Day. Brother Prophet Noble Drew Ali Reincarnated arrived in Chicago, Illinois.

7. June 7th, 570-632 A.D. Observance Day. Birthday of Prophet Mohammed 1st. Arabian Prophet Founder of the uniting of Islam in Arabia.

8. June 17th, 1928. Observance Day. Prophet Noble Drew Ali led the parade in Chicago, Ill. marking the Moorish Calendar.

9. June 18th, 1880. Holiday. Birthday of Brother Ira Johnson Bey (Allah-El), (1879-1949). The Nazarene.

10. June 20, 1797. Holiday. The Crown of Washitaw. U.S. Land Grant No. 923; Plan No. 1518; Register No. 3, April 12, 1802.

11. July 20th, 1929. Observance Day. Prophet Noble Drew Ali passed in Chicago, Illinois.

12. August 7th, 1929. Greatest Holiday of them all. Prophet Noble Drew Ali reincarnated back into one of his disciples. Brother Prophet Noble Drew Ali Reincarnated.

13. August 17th, 1929. Observance Day. Birthday of Marcus Garvey, (1887-1940). Forerunner of Prophet Noble Drew Ali, the Founder of the Moorish Science Temple of America.

14. September 19th, 1929. Holiday. Prophet Noble Drew Ali publicly announced his reincarnation at Pythians Hall, 3737 State Street, Chicago, Illinois. "I am back," said the Reincarnated Prophet.

15. October 7th, 1942. Holiday. Birthday of brother Prince Davis Ali El (1942-1996). Little Brother.

16. October 14th, 2005. Observance Day. Sister Eva Ali El, passed in Chicago, Illinois.

17. October 21, 1945. Observance Day. Brother Prophet Noble Drew Ali Reincarnated pulled the old ancient Canaanite trick again. Stepped out of the form at 447 East 40th St., Chicago, Illinois.

18. December 5th, 1949. Observance Day. Brother Allah-El (The Nazarene) passed in Menard, Ill. He also pulled the old ancient Canaanite trick.

19. December 6th, 1904. Holiday. Birthday of Brother Prophet Noble Drew Ali Reincarnated (1904-1945).

20. December 19th, 1925. Observance Day. The Star and Crescent appeared in the heavens. Allah's sign to man that His Noble and Divine Prophet Drew Ali was in North America teaching ISLAM. "Islam hangs low in the western sky."

Revised By: Sheik Richard Drew Bey 2006 Michigan

Created By: Master/Supreme Grand Sheik Brother Charlie Warren El (1939-1987) 1976C Chicago

Muhammad Rashid Rida
[b. 186_ – 935 d.]

Aziz Ali Al-Misri Bey
[b. 1878 – 1965 d.]

Jamal al-Din al-Afghani
[b. 1838 – 1897 d.]

Muhammad Abdul Al-Sheikh
[b. 1849 – 1905 d.]

Leon Richelieu–El
[b. 1870 – 1964 d.]

Mary Lou Foreman Ali
2nd Wife

[Noble Drew Ali, Reincarnate]
John Givens Ali El = Eva Ali El
[b. 1904–1945 d.]    [b. 1912–2005 d.]
[Indigenous Washitaw Nation of Muurs]
James Lomax Bey   Ira Johnson Bey
Washitaw Muur         Allah El
                              [b. 1879 – 1949 d.]

Frederick Turner El   Sister Eva Ali El
Washitaw Muur           [b. 1912 – 2005 d.]
[Indigenous Washitaw Nation of Muurs]
Verdiacee Washitaw Tunica Goston El-Bey
Empress of the Washitaw Nation of Muurs
[born: May 4, 1927, Ouachita Parish, Louisiana]

El-Sefi Anu Ali-El, Ravanna S. Bey [TRUSTEE
Washitaw Moorish Land Grant [U.S. No. 923, 1802
NORTH AMERICAN CONFEDERATION OF MUURS UNITED UNDER THE INDIGENOUS LAND GRANT

Duse Mohammed Ali
[b. 1866 – 1945 d.]

Arnold Josiah Ford–El
[b. 1890 – 1950 b.]
[Indigenous Washitaw Nation of Muurs]
Pearl Ali = Timothy Turner, Noble Drew Ali
1st Wife
[b. 1886 – 1929 d.]

William Saunders Crowdy
[b. 1847 – 1909 d.]

Marcus Mosiah Garvey
[b. 1887 – 1940 d.]

Wentworth A. Matthew-El
[b. 1892 – 1973 d.]
[Indigenous Washitaw Nation of Muurs]
Farrad Muhammad Drew Ali
[b. 1879 – 1934 d.]

Edward Mealy El  Foreman Bey  Charles Kirkmen Bey
[b. 1887 – 1935 d.]                          [b. 1883 – 1959 d.]
Sister D. Mealy El
[b. 1913 – 1981 d.]
R. German Bey          F. Nelson Bey
[b. 1913 – 1985 d.]
Prince M. Ali El          J. Blakely Bey
[b. March 13, 1941]
John Given El's Son     R. Love El
Reincarnate Temple
National System           R. Jones Bey

Paul Robert Pool Bey
Elijah Muhammad
[b. 1897 – 1975 d.]

Malcolm [Little] X
[b. 1925 – 1965 d.]
[Indigenous Washitaw Nation of Muurs]
Richardson Dingle-El

Timothy Dingle-El

Sister Louise Dingle-El

ker T. Washington
b. 1856 – 1915 .d]

(Exhibit A-9)

# CERTIFICATE OF AUTHORITY

## MOORISH SCIENCE TEMPLE OF AMERICA



January 11 , 1999

Re: Emperial Appointment

This is give official notice of the appointment of Dr. Ravanna Bey as Minister of Education & Research for the Empire Washitaw de Dugdahmoundyah. We are encouraged about his past efforts of wanting to find the "Truth" and to get this information to the people. We are looking forward to him being a catalyst for others to have the same motivation to find out their true history. Thank you Dr. Bey and congratulations.

Ravanna: Sanders-Bey, Washitaw Ambassador-At-Large
Washitaw Minister of Education and Research
C/o Post Office Box 21318
[via: u.s.A. postal-zone 60621-0318]



Love ,Peace Truth, Freedom and Justice

Her Highness Verdiacee "Tiari" Washitaw-Turner Goston El-Bey; Empress
Uaxashaktun°Uaxactun°Wat°Shr°

```
 7
```
Helen McLaughlin
Secretariat
International Year
of the
World's Indigenous People
July 1993

# INTERNATIONAL JURISDICTION AND EXTRATERRITORIALITY

U.S. Land Grant No. 923 [Certificate: June 14, 1771 Plat No. 1944; Register No. 3, April 12, 1993]
A CESTUI QUE TRUST–INDENTURE AGREEMENT BETWEEN SOVEREIGN PRIVATE PARTIES

c/o P.O. Box 21318, Chicago. Washitaw Province. Via. u.s.A. postal zone: 60621-0318

Her Highness Verdiacee "Tiari" Washitaw-Turner Goston El-Bey: Empress
UAXASHAKTUN °UAXACTUN °WST °SHT

(Exhibit 8)

UNITED NATIONS

CENTRE FOR HUMAN RIGHTS
CH 1211 GENEVE 10  SWITZERLAND
TEL (41) 22 917 1234/ 907 1234
FAX (41) 22 917 0123

Indigenous
People

INTERNATIONAL YEAR 1993

# Office of the United Nations High Commissioner for Human Rights
## (OHCHR)
## OHCHR-UNOG
## 8-14 Avenue de la Paix
## 1211 Geneva 10, Switzerland
## Telephone Number (41-22) 917-9000

TO ORGANIZATIONS THAT HAVE SENT IN SUBMISSIONS FOR GRANTS FOR
PROJECTS FROM THE VOLUNTARY FUND FOR THE INTERNATIONAL YEAR OF
THE WORLD'S INDIGENOUS PEOPLE

### THIS REFERS TO PROJECTS REGISTERED SINCE 1 MARCH 1993

Thank you for your submission seeking a grant from the Voluntary
Fund for the International Year of the World's Indigenous People.

Your project has been registered as Project Number 215/93

We expect to hold the next meeting to consider projects in late
August 1993.

Helen McLaughlin
Secretariat
International Year
of the
World's Indigenous People
July 1993

# INTERNATIONAL JURISDICTION AND EXTRATERRITORIALITY

The Visigoth kingdom in the region that is now Spain and Portugal was invaded by Muslims in 711. By 756, the territory had been annexed to Islam and the Muslim kingdom of Córdoba established. Around 1000, Christians left in the northern territories began a 500-year crusade to regain Spain for Christendom. Their campaign is known as the *Reconquista* (Reconquest).



**EVENTS**

750 — By 756 Arab and Berber Muslims (Omayyad dynasty) conquer Spain from Visigoths

796 Frankish king Charlemagne establishes Spanish March to defend his Empire from Muslims

By 812 Charlemagne expands Spanish March to include Barcelona

978 Almansor, ruler of Christian kingdom of León, conquers Muslim provinces weakened by civil war

1000

1029 Castile, Navarre, and Aragón become separate but allied Christian kingdoms

1037 Ferdinand I the Great of Castile unites Castile and León

1085 Conquest of Toledo. Castilian general Rodrigo Díaz de Vivar (known as El Cid), leads Christians in defeat of Muslims (Almoravid dynasty)

1139 Alfonso I establishes Christian Kingdom of Portugal and expands his kingdom southward

1200 — 1212 Battle of Las Navas de Tolosa. Muslims (Almohad dynasty) defeated decisively by Castilian forces. Collapse of Muslim Almohad state follows

1238 Aragón takes Valencia from Muslims

1217–1252 Ferdinand III the Saint of Castile conquers Córdoba (1236) and all remaining Muslim lands in southern Spain, except Granada

1492 Isabella of Castile and Ferdinand II of Aragón defeat Muslims in Granada. End of Reconquest

1500



(Exhibit A-10)

**Muslim lands, ninth and tenth centuries**

● Frankish strongholds

Dār al-Islām

Umayyad raids

Aghlabid raids

SARDINIA

SICILY
Tunis
Kairouan

Tripoli

Mediterranean Sea

Alexandria
Cairo

the Fatimid caliphate,
909–1171

Black Sea

Constantinople

BYZANTINE
EMPIRE

CRETE
CYPRUS

Jerusalem
Damascus

Baghdad
ABBASID
CALIPHATE

Salāh al-Dīn's Empire 1171–93

Medina
Mecca

Caspian Sea

Aral Sea

| | |
|---|---|
| Omayyads 756–1031 | |
| Idrisids (Shi'ite Idrisids) 789–926 | First Crusade 1096–99 |
| Aghlabids 801–909 | Third Crusade 1189–92 |
| Tulunids 868–905 | |

**NORTH AFRICA AND EGYPT UNDER THE FATIMIDS**

**EGYPT AND SYRIA UNDER THE MAMLUKS, 1250 TO 1517**

**EGYPT**

**MOROCCO**

Sharifian
empire under
the 'Alawi-s
(1672 to the
present)

Beys at the head of
Mamluk house-
holds. After 1805 a
hereditary royal
family of Albanian
origin.

M. Al-Sharif

*Morocco: the 'Alawi dynasty*

M. Muhammad

M. al-Rashid
1666–72

M. Isma'il
1672–1727

M. Ahmad
1727–8

M. 'Abd al-
Malik

M. 'Abd Allah
1728–57

M. Muhammad

M. 'Ali

**THE BARBARY REGENCIES**

| Tripoli | Tunisia | Algeria |
|---|---|---|
| Qaramanli dynasty (1711–1836) | Dynasty of the Husayni Beys (1705–1957) | Turkish appointed Beys until the French invasion (1830) |
| A hereditary ruling family, recognized by the Ottoman authorities. The Kulughli-s were an important group up-holding Qaramanli | A growingly independent dynasty ruling over a well-knit national community. | A military regime maintaining close links with Turkey |

S. Muhammad
1757–90

M. Yazid
1790–2

M. Hisham

M. Sulayman
1792–1822

M. 'Abd al-Rahman
1822–59

S. Muhammad
1859–73

M. Hasan
1873–94

# OTHER PROFESSIONAL EXPERIENCE
## (Some of Ravanna Bey Credentials)

Cook County Highway Department
Richard J Daley Civic Center
50 West Washinging Blvd.
Chicago, Illinois 60602
    Draftsman, 1968-1973
    Summers

Central States Pension Fund
Mid-West Teamster's Union
8553 West Bryn Mawr
Chicago, Illinois 60656
Special Liaison, 1973-1976
Full-Time

Empire Washitaw de Dugdahmoundyah
UN Indigenous Nation #215-93
c/o Post Office Box 1509
Columbia, Washitaw Proper
via, U.S.A. Postal Zone 71418
    Special Appointment
    Secretary (January 11, 1999)
    Education and Research

Moorish Science Temple
Quintuple-A, International
c/o Post Office Box 21318
Chicago, Washitaw Provence
via U.S.A. Pz 60640
Special Appointment
Secretary (February 14, 1982)
Reincarnate Temple , Chicago

# ACADEMIC STUDIES:

Chicago State Univerity
Corrections and Criminal Justice
95th Street at Dr. M.L. King Drive
Chicago, Illinois 60628
    1987 Masters of Science
    Corrections and Criminal Justice

Garrett Evangelical Theological Seminary
Northwestern University, School of Theology
2121 Sheridan Road
Evenston, Illinois 60201
    1987 Candidacy, Masters of Theological
    Studies and American History

Loyola University of Chicago
Anthropology/Sociology Department
6522 North Sheridan Road
Chicago, Illinois 60626
    1982 Bachelor of Science
    Anthropology/Sociology

City College of Chicago, Truman College
Social science Department
1145 West Wilson Avenue
Chicago, Illinois 60640
    1980 Associate of Arts and Science
    High School Teaching, Social Studies

International Institute for Mesopotamian
Area Studies, Near Eastern History
Malibu, California 90265
    1983-1985 Independent Study
    Near Eastern History

Center for Middle Eastern History
University of Chicago
Chicago, Illinois 60637
    1982-1983 Graduate Study
    Middle Eastern History

University of Chicago
The Oriental Institute
Chicago, Illinois 60637
    1976-1978 Independent Studies
    Nile Valley Area Studies

University of Illinois
School of Engineering
Champaign-Urbana, Illinois 61820
    1968-1970 Undergraduate Studies
    Architectual Engineeering

La Salle University
418 South Plymouth Court
Chicago, Illinios 60604
    1968 Diploma
    Architectural Drafting

State of Illinois, County of Cook
State Teacher Certification Board
Certification: number 142 8609
Current type 39

# LA SALLE EXTENSION UNIVERSITY

A Correspondence Institution ~ Founded in 1908



The Board of Directors have awarded to

## Ravanna M. Bey

this DIPLOMA in

## Complete Architectural Drafting

in recognition of the satisfactory completion of the required course of study

In testimony whereof the seal of the University and
the signatures of its duly authorized officers
are hereunto affixed

Given at Chicago, Illinois, on this 10th day of May 1968

_____
Educational Director

_____
For the Board of Directors



UNITED NATIONS

CENTRE FOR HUMAN RIGHTS
CH-1211 GENEVE 10  SWITZERLAND
TEL (41) 22 917-1234/ 907-1234
FAX (41) 22 917-0123

(411 22) 917-1234
907-1234

Fax   917-0123



INTERNATIONAL YEAR 1993

# WashiTa NaTion

TO ORGANIZATIONS THAT HAVE SENT IN SUBMISSIONS FOR GRANTS FOR
PROJECTS FROM THE VOLUNTARY FUND FOR THE INTERNATIONAL YEAR OF
THE WORLD'S INDIGENOUS PEOPLE

### THIS REFERS TO PROJECTS REGISTERED SINCE 1 MARCH 1993

Thank you for your submission seeking a grant from the Voluntary
Fund for the International Year of the World's Indigenous People.

Your project has been registered as Project Number 2/5 /93.

We expect to hold the next meeting to consider projects in late
August 1993.

Helen McLaughlin
Secretariat
International Year
of the
World's Indigenous People
July 1993

# ☪ Empire
# Washitaw de Dugdahmoundyah

## PROCLAMATION
It is now herein and hereby proclaimed that:

UCU111/07/02:01:1471:
20.00 00:01
00°IL 10:02    8075812 PC

H.R. #260, currently under consideration by the 105th congress, cited as the "Guadalupe-Hidalgo Treaty Land Claims Act of January 7, 1997, is disclaimed by the indigenous people of the Washitaw de Dugdahmoundyah because it is Washitaw land and not land belonging to the United States, the united states, or the United States of America and it is foreign land to the proposed bill H.R. # 260 of the 105th congress of the maker. It is owned and claimed by the Washitaw de Dugdahmoundyah since the beginning of time and reclaimed as per the government of Spain claimed and released to the Ancient Ones according to the legal demarcation lines.

The following hereby attached and herein now disallowed and disclaimed; therefore this proposed bill H.R. #260 of the 105th congress is null and void in the Washitaw de Dugdahmoundyah land west of the demarcation line.



THE ADAMS-ONIS
TRANSCONTINENTAL LINE

Scale of Miles
0    100    200    300    400

Exhibit A-14



"Prophet Noble Drew Ali Reincarnated" Founder of the Moorish Science Temple of America Aug. 1934

Exhibit A-15

## Prophet Noble Drew Ali (Reincarnated)
### (Dec. 6, 1904 - Oct. 21, 1945)



Prophet Noble Drew Ali, Reincarnated was born December 6, 1904 in Sumter, South Carolina to John and Sally Givens. At the age of 20 years, he moved to Chicago, Illinois and became an auto mechanic where he united into the Moorish Holy Temple of Science and became a member of the Adept Chambers.

On August 7, 1929, the spirit of the Founder, Prophet Noble Drew Ali, reincarnated in the form of John Givens El to be later known as Prophet Noble Drew Ali, Reincarnated. On September 19, 1929, Prophet Noble Drew Ali, Reincarnated made this truth known at Pythians Hall.

Prophet Noble Drew Ali, Reincarnated taught from his residence at 447 E. 40th Street until October 21, 1945 at which time he passed out of his form.

Many visitors came from the Temples to visit and be counseled by him, as well as to seek advice on every aspect of life.



(Exhibit A-19)

# MUURS OF NORTH AMERICA: PROPHET NOBLE DREW ALI

**Austin, Allan D.**, Editor
   1984    African Muslims in Antebellum America: A Sourcebook.
            New York: Garland.

**Berger, Morroe**
   1964    "the Black Muslims." In:
            Horizon. (January 6, 1964) **Pp. 49–64.**

**Beynon, Erdmann Doanne**
   1938    "the Voodoo Cult Among Negro Migrants in Detroit." In:
            American Journal of Sociology. **Vol. 43** (May **1938**) **No. 6. Pp. 894-907.**

**Bousquet, G. H.**
   1935    "Moslem Religious Influence in the United States.    In:
            Moslem World. (January 1935) Vol. 32. Pp. 40–44.
   1935    "A Moorish Catechism." In:
            Moslem World. (January 1935) Vol. 32. Pp. 55–59.

**Boutemps, Aran and Jack Conroy**
   1965    Any Place But Here.
            Garden City, New York: Doubleday.        New York: Hill and Wang, **1966.**
   1945    They Seek a City.
            New York: Doubleday, Doran and Company, Inc..

**Blyden, Edward Wilmot**
   1888    Christianity, Islam and the Negro Race.
            Edinburgh, Scotland: Edinburgh University Press [a Reprint in 1967]

**Calverley, Edwin E.**
   1965    "Negro Muslims in Hartford." In:
            Muslim World. Vol. 55 (October 1965) Pp. 340–345.

**Chicago Defender**    [An African–American News Paper in Chicago]
   1928    June    30    "Moorish Leaders' is Postmaster's Quest"
   1928    July    14    "Moorish Leader Makes Plans for Conclave"
   1928    Oct.    20    "Hold Session of Moorish Science Body" Vol. XXIX, No. 25.
   1928    Dec.    01
   1929    Jan.    19    "Moorish Leader Attends Inauguration of Governor" Part I, Pp. 7.
   1929    Jan.    05    "Moors to Celebrate Birthday of Founder" Saturday.
   1929    March   16    "Death of 'Claude Greene' "
   1929    March   23
   1929    May     04
   1929    July    20
   1929    August  03    **"Most Noble Drew Ali is Laid to Rest"**
                         [Lincoln Cemetery, 123 Street & Kedzie]
   1929    Sept.   28    "Disband Moorish Cult" Vol. XXV, No. 22.

**EMPRESS: THE CROWN = CALIPHATE, CHIEF REPRESENTATIVE OF GOD**

**PROPHET: THE MAHDI = GOD'S INTERVENTION AT INTERVALS: 2012**

## CABINET: COUNCIL OF MINISTERS
### Independent Order of Succession

| | | |
|---|---|---|
| Premier: Vizier | = Sultanate | Chief Executive Officer |
| Secretary General | = Sheikdom | Chief Legislative Officer |
| Foreign Minister | = Beylic | Chief International Officer |
| Treasury Minister | = Pasha | Chief Financial Officer |
| Attorney General | = Khanate | Chief Law Enforcement Officer |

### PARLIAMENTARY = SYSTEM OF LEGISLATION     [LAW MAKING BODY]

| SECRETARIAT: | ROYAL SHEIKDOM | |
|---|---|---|
| Secretary General: | Supreme Grand Sheik<br>Professional Advisers<br>Legal Counselors | Chief Legislative Officer |
| Upper House: | Board of Grand Sheiks<br>National Committees | Regional Moorish Temples |
| Lower House: | Council of Local Sheiks<br>Local Committees | Local Moorish Temples |

### JUDICIARY = SYSTEM OF JUSTICE     [LAW INTERPRETATION BODY]

| | | |
|---|---|---|
| Supreme Grand Qadi: | Chief of Five Justices | [National Court] |
| Grand Qadi: | Chief of Three Judges | [Regional Court] |
| Qadi: | Constable/Magistrate | [Local Sheriff] |

### EXECUTIVE = SYSTEM OF CORRECTIONS     [LAW ENFORCEMENT BODY]

| ATTORNEY GENERAL: | ROYAL KHANATE | |
|---|---|---|
| Attorney General: | | Chief Law Enforcement Officer |
| Supreme Grand Mufti: | National Chief of Police | |
| Grand Mufti: | Regional Chief of Police | |
| Mufti: | Local Chief of Police | |

VIENNA CONVENTION ON CONSULAR RELATIONS [VCCR]
El Seti Anu Ali El

VIENNA CONVENTION ON DIPLOMATIC RELATIONS [VCDR]
Ravanna Sanders Bey

(Exhibit - A-19)

# ALI'S SACRED IMAMATE: EMPIRE WASHITAW DE DUGDYAHMOUNDYAH

## EMPRESS: THE CROWN = CALIPHATE, CHIEF REPRESENTATIVE OF GOD

## PROPHET: THE MAHDI = GOD'S INTERVENTION AT INTERVALS: 2012

## SANHEDRIN: COLLAGE OF ELDERS = GRAND SHEIKS: IMAMS

### Independent Order of Succession



Verdiacee Tiari El-Bey
Emperial Crown

| First | Grand Sheik | = New York City | North East | Region |
| Second | Grand Sheik | = Chicago | Mid-West | Region |
| Third | Grand Sheik | = Los Angeles | West Coast | Region |
| Fourth | Grand Sheik | = Atlanta- | South East | Region |
| Fifth | Grand Sheik | = Huston | South West | Region |
| Supreme Grand Sheik | = New Orleans | | International | |
| National Grand Sheik | = Washington D C | | National | |

## SECRETARIAT: ROYAL SHEIKDOM: SACRED IMAMATE





Int'l Grand Sheik
Ravanna Sanders
Bey, Ambassador

Illinois Grand Sheik
Bakare McFarland-Bey

Secretary General:   International, Supreme Grand Sheik
Washitaw Ambassador-at-Large

SADDUCEES:   Board of Grand Sheiks/Imams
Congress   Washitaw Moorish Imamate

PHARISEES:   Council of Local Sheiks/Ulama
Assembly   Washitaw Moorish Ulama

## JUDICIARY:  GUARDIANS OF SALAFIYA

Supreme Grand Qadi: Chief of Five Justices   Deputy International Grand Sheik/Imam
Master Grand Qadi: Chief of Three Judges   Deputy International Grand Mufti/Khan
Grand Qadi: Constable/Magistrate   State Chair, Council of Local Ulama
Qadi:Local Justice of the Peace   Local Chair, Council of Local Ulama

## ROYAL KHANATE: HOUSE OF WASHITAW, SACRED SALAFIYA



Amir El Seti Anu
Int'l Grand Mufti
Counsel General

Attorney General:   International, Supreme Grand Mufti/Khan
Washitaw Counsel General-at-Large

Supreme Grand Mufti/Khan:  Chief Law Enforcement Officer
Master Grand Mufti/Khan:  Deputy Chief Enforcement Officer
Grand Mufti/Khan:  State Law Enforcement Officer
Mufti/Khan:  Local Chief of Police/Security

## IMPERIAL EMIRATE:  ADMIRALTY



Emir/Admiral: Commander-in-Chief, Amir
Joint Chief of Staff: Chairman







( Exhibit  A-20 )

EXHIBIT A-21

## EMPERIAL EMPIRE WASHITAW de DUGDAHMOUNDYAH

The Washitaw Nation of Muurs are an Indigenous Peoples of North America. The Ouachita, otherwise known as the Olmec, had been originally associated with the Washitaw. Accordingly, the Washitaw had been the primary group of a more general population of Indigenous Peoples identified in history as Amurru: "The Muurs."

Known to the Spanish and the French, the Washitaw have come to be known to the English as an Adena-Hopewellian people identified with Punic Iberian affinity maintaining an Andalusian-Carthaginian heritage. As such, the Washitaw have been associated with the Eastern Algonquian Native Americans, having acquired an ancient Egyptian, as well as Punic script and vocabulary, as they have appeared in the epigraphic record of North America.

The Imperial House of de Bourbon, since the Treaties of Utrecht (1713), has recognized the Washitaw Nation of Muurs as Masters of the Whole of North America. The Spanish and the French de Bourbons became the Protectorate of the Washitaw west of the Imperial Demarcation Line.

The end of the French and Indian War against the British had marked the point when the Emperial Empress of the Washitaw had been recognized as the Sovereign of all North America by the de Bourbon French and Spanish Imperial Houses. Ayimarieeyah was to become the heir to the throne and Empress of the Empire Washitaw de Dugdahmoundyah. She would be eldest daughter of the reigning Empress.

Meanwhile the eldest son of Louis XVI becomes heir to the French Crown and later Louisiana Dauphin. The young heir to the French throne LOUIS XVII, would become wed to the young heiress to the Washitaw-Tunica Throne, Ayimarieeyah. The Emperial/Imperial marriage would become official in 1795, pursuant to the conveyance of Spanish Land Grants bestowed upon the young heir, LOUIS XVII, and his young wife and heiress, AYIMARIEEYAH. These two would also receive the Imperial Spanish Land Grant of 1763.

In the year before the end of the French and Indian War (1762), the French de Bourbon transferred the Imperial Protectorate and legal-political jurisdiction of the Louisiana to the Spanish de Bourbon, pursuant to the Treaty of San Il-deFonso of 1762. The Spanish in turn conveyed to the French the Imperial Spanish Land Grant of 1762.

The Louisiana became the personal and private property of the French Crown. French ownership of the Louisiana was re-affirmed, pursuant to the Treaty of San Il-deFonso of 1796. Moreover, in 1795, given the marriage between LOUIS XVII and AYIMARIEEYAH, the Imperial Spanish Land Grant of 1762 became their personal and private property.

As recipient of both the 1762 and 1795 Spanish Land Grants, LOUIS XVII become known as the MARQUIS de MAISON ROUGE: OWNER of LOUISIANA and the FLORIDAES.

On two historical occasions: the first, after the french and Indian
War (1763); and the second, after the American Revolutionary War (1783):
The Imperial Demarcation Line of 1713, as well as the 31st parallel,
had been recognized, acknowledging both Louisiana and the Floridaes.
The Demarcation Line and 31st parallel had been honored by the Spanish,
the French and the British, pursuant to the treaties of Utrecht (1713),
the Treaty of Paris of 1763 and the Treaty of Paris of 1783.

Moreover, the French were recognized as the Protectorate of the
Empire Washitaw de Dugdahmoundyah (Louisiana and the Floridaes).  Even
more, the Treaty of San Il-deFonso of 1762 acknowledged the transfer
of Louisiana from the French to the Spanish; but the Louisiana was
returned tot he French Crown, pursuant to the Imperial Spanish Land
Grant of (1762).  However, although the British Royal Proclamation of
1763 would honor the Demarcation Line of 1713, the British would not
recognize the Imperial Spanish Land Grant to the French Imperial Crown.

Meanwhile, the british would become the Protectorate of the
Washitaw Nation of Muurs pursuant to the British Royal Proclamation
of 1763.  Nonetheless, the British would not honor the Franco-Washitaw
claim to the Louisiana East of the Mississippi River ending with the
Imperial Demarcation Line of 1713.

However, the British would recognize the Spanish-Washitaw claim
to Louisiana West of the Mississippi River pursuant to the treaty of
Parish of 1783, as well as the Pinckney Treaty of San Lorenzo of 1795,
which recognized both the Mississippi River and the 31st parallel as
boundaries for Spanish Louisiana and the Spanish Floridaes.  The British
would recognize the Spanish de bourbon as the Protectorate of the
Washitaw Nation of Muurs domicile in Louisiana and the Floridaes.

The protection of Washitaw sovereignty had been affirmed by both
the Treaties of Paris of 1763 and the Treaty of Paris 1783, when the
United States of America emerged as the sole military force in opposition
to Washitaw sovereignty.

In violation of the 1783 Treaty of Paris, given the Battle of
Fallen Timbers (1794) and subsequent treaty of Greenville (1795), the
United States of America dishonored the Imperial Demarcation Line of
1713 and the British Royal Proclamation of 1763.  Later, in 1789, the
United States of America incorporated to become the United States.

The United States government assumed military control over North
America east of the Mississippi River pursuant to the Treaty of Paris
of (1783) and U.S. Incorporation of 1789.  The former British Quebec-
Louisiana (1774-1789) became U.S. Northwest Territory north of the Ohio
River; while the Louisiana south of the Ohio River became U.S. Southwest
Territory.  See U.S. Southwest and U.S. Northwest Ordinances of the
Corporate U.S. government.

Meanwhile, the Treaty of San Lorenzo (1795), also known as the
Pinckney Treaty re-established the 31st parallel as the southern boundary
of the United States of America, acknowledging the Spanish Floridaes
and the Spanish Louisiana west of the Mississippi River.  The Spanish

de Bourbon would now serve as the Protectorate of the lands and sovereignty of the Washitaw Nation of Muurs.

Given the "Secret Treaty" of San Il-deFonso of 1800, the de Bourbon Charles IV, King of Spain, seceded to the French Imperor, Napoleon I Bonaparte, the seaport city of New Orleans ONLY. The whole of Spanish Louisiana was not conveyed or transferred to Napoleon I. So when Napoleon seceded the Port City of New Orleans to U.S. President Thomas Jefferson as the so-called Louisiana Purchase treaty of 1803, the whole of Louisiana west of the Mississippi River was NOT included. This fact has been secure in the original documents: The Secret Treaty of San Il-deFonso of October 1, 1800. See also the Secret treat of San Il-deFonso of 1762, for the Imperial Spanish Land Grant conveyed to the French crown in the person of LOUIS XVI.

Meanwhile, given the death of both the heir to the French Crown, LOUIS XVII, and the heiress to the Washitaw Throne, AYIMARIEEYAH, the Titles of Louisiana Dauphin and Regent MARQUIS de MAISON ROUGE were conveyed to the next-in-line to the Imperial French Crown, Louis Francis Joseph de Bourbon, Prince de Conti (1734-1814) the son of Louis Francis de Bourbon, Prince de Conti (1717-1776).

Louis XVII and Ayimarieeyah had been wed in 1795; and now their daughter ANNIAMAREE, was to be wed to Joseph de Bourbon, Prince de Conti. A second daughter of Louis XVII and Ayimarieeyah, LULIA DANIEL, was to be wed to the French Nobleman, Louis Boulingny Garrison. As the 2nd MARQUIS DE MAISON ROUGE, Joseph de Bourbon became the recipient of both the Imperial Spanish Land Grant of 1762 and Spanish Land Grant of Monroe, Louisiana. With the death of Joseph de Bourbon in 1814, his eldest son HENRY JOSEPH TURNER inherited the Maison Rouge estate.

Mahalia Garrison, the eldest daughter of Louis Boulingny and Lulia Daniel became the next Empress of the Washitaw. Meanwhile, HENRY JOSEPH TURNER the eldest son of the 2nd MARQUIS de MAISON ROUGE, Louis Francois Joseph de Bourbon, Prince de Conti and Anniamaree, the Empress of the Tunica-Washitaw.

HENRY JOSEPH TURNER became the recipient of the 1762 and 1795 Imperial Spanish Land Grants: the 3rd MARQUIS de MAISON ROUGE.

Mahalia Garrison married William "Bill" Kimms-Badger and from this union will come their eldest son: Isham Washitaw (Washington). HENRY JOSEPH TURNER (d. 1844) married Sarah Tunica; and from this union will come their eldest son: JOSEPH HENRY TURNER: the 4TH MARQUIS DE MAISON ROUGE.

Isham Washington will marry Delphia Kimms-Badger (1850-1967); and from this union will come their eldest son: Fredderx Houston Washington. JOSEPH HENRY TURNER (whose sister is Eliza Turner, the mother of the Prophet Noble Drew Ali) will marry Matilda; and from this union will come the eldest daughter: Annie Frankee Turner.

Fredderx Houston Washington, Regent of the Empire Washitaw de Dugdahmoundyah will marry Annie Frankee Turner, the recipient of the

1762 and 1795 Spanish Land Grants and the heir of the Henry Joseph Turner estate. The eldest daughter of Fredderz and Frankee is the current Emperial Empress of the Washitaw: Verdiacee "Tiara" Washington. Verdiacee is married to John Goston, the son of Corrella Turner. ~~Corrella is the daughter of~~ Corrella is the daughter of Eliza Turner. Eliza is the mother of the Prophet Noble Drew Ail. Corrella and Drew Ali are brother and sister. Eliza is the daughter of Sarah Tunica and Henry Joseph Turner (d. 1844). John Goston had been the 6th MARQUIS de MAISON ROUGE after Noble Drew Ali, who had been the 5th MARQUIS de MAISON ROUGE.

A direct descendant of LOUIS XVII and AYIMARIEEYAH, Verdiacee "Tiara" (b. May 4, 1927) is the sovereign. The U.S. Supreme Court case nos. 31 & 191 of 1848, <u>United States v. Henry Turner's Heirs</u>, affirms the estate of the Washitaw: 68,883 acres of land constituting the northern half of the present state of Louisiana. The land is the personal and private property of the Empress, heir to the 1795 Spanish Land Grant Maison Rouge. The land now serves as the capital area (Washitaw Proper), of a much larger land claim.

In the context of International Law the Washitaw has established itself as a Sovereign Independent Nation (United Nations, NIS-21/593) apart from the corporate Union of 1781 and the corporate United States of 1787. The land claim of the Washitaw has been affirmed by the Spanish and French, as well as the British, pursuant to Spanish Land Grants of 1762 and 1795.

In the context of U.S. Federal law the land of the Washitaw has been defined as "Indian Country" and the people regarded as "Indians". Both the people and their land have been placed under the authority of the United States government via the Bureau of Indian Affairs within the Department of Interior, which is governed by both Executive and Congressional Plenary Powers. As a result, the United States has assumed the "trust responsibility" for the Washitaw Nation of Muurs via Spanish Land Grant of Henry Turner.

Indigenous Peoples, such as the Washitaw Nation of Muurs, owe no allegiance to any of the fifty states neither of the Union nor to the United States. While Washitaw Muurs are domicile, they are not resident in any of the United States. Washitaw Muurs are not Native American nationals nor are they state or fourteenth Amendment U.S. citizens. The Indigenous Washitaw Muurs are a "separate people" of sovereign status. They are, in accordance with Federal and International laws, non-resident aliens with respect to any of the fifty states and the United States. However, if the ~~lands~~ of Indigenous Peoples do not comprise foreign nations and the peoples of those lands are dependent on Federal and international laws, then there arises the duty of protection.

Diversity of Citizenship Jurisdiction

Since the Judiciary Act of 1789, "diversity jurisdiction has been bestowed statutorily on the Federal court, (1 Stat 78); however, Justice Brandeis made it clear that the unconstitutional assumption of the

federal power (hence, Supremacy Clause) had been made not by Congress but by the Court. Brandeis continues in Erie R. Co v. Tompkins (304 U.S. 79-80-1939):

> ...we do not hold unconstitutional (section) 34 of the Federal Judiciary Act of 1789...we merely declare that in applying the doctrine this court and the lower courts have invaded rights which in our opinion are reserved by the Constitution to the several states.

Indeed, the U.S. Supreme Court has insisted, since 1939, that: "Except in matters governed by the Federal Constitution of by Acts of Congress, the law to be applied in any case is the laws of the state. Whether the law of the State shall be declared by its Legislature in a statute or by its highest court in a decision is not a matter of Federal concern (Erie ñ 78).

The point is this: Federal judges are to give careful consideration to lower state court decisions. In diversity of citizenship cases which present conflicts of law problems the court has reiterated that the district court is to apply the law of the state in which it sits,...

> ...so that in a case in State A in which the law of State B is applicable perhaps because a contact was made there or a tort was committed there, the Federal court is to apply State A's conception of State B's law. See Nolan v. Transocean Air Lines (365 U.S. 293, 1961).

The standard to be applied has been, since the Erie decision "intent," which...

> ...was to insure that, in all cases where Federal Court is exercising jurisdiction solely because of the diversity of citizenship of the parties, the outcome of the litigation in the Federal Court should be substantially the same, so far as legal rules determine the outcome of the litigation as it would be if tried in a State court. See Guaranty Trust Co. v. York (326 U.S. (326 U.S. 99, 1945).

Despite Justice Brandeis' assurance in the Erie case that there is not "Federal general common law" in 1939, there is a common law existing today in the Federal courts, even in diversity cases, stemming from the use of the Uniform Commercial codes. For the purposes of diversity jurisdiction, state citizenship is determined by the concept of domicile. See Chicago & N.W.R. Co. v. Chile, (117 U.S. 123, 1886). One may be domicile in one's own State and not be a resident of either the United States or any one of the fifty states of America.

FEDERAL PREEMPTION DOCTRINE

The Washitaw Nation of Muurs consider outrageous any idea that justifies strong arm rules such as the doctrine of "discovery," the idea that transmutes Indigenous land ownership (Fee title) into a "right of occupancy: NOT protected by the Fifth Amendment. This line of reasoning, on the part of European colonizers, has given credence to the doctrine of Federal Preemption.

The Federal preemption doctrine holds that the U.S. Constitution delegates regulation of "Indian" affairs to the Federal government rather than to individual states, and Indian Nations do not constitute states. The doctrine dates back to the Albany Plan of the Union (1754), in which Benjamin Franklin described unitary control over "Indian Affairs" so that Indians would not be forced to deal with the government of several different british Colonies. Accordingly, Indigenous Peoples were to become "domestic wards" of the Federal government. They were to become dependent upon the goodwill of the Federal government.

As a result, it has become quite apparent that from the formation of the Union (1787) and the adoption of the Bill of Rights (1791), the protection of Indigenous Peoples, such as the Washitaw Nation of the Muurs, has been responsibility of the Federal government. There was to be NO unwarranted intrusion on the sovereignty of the Indigenous Peoples.

Under the Supremacy Clause Federal law preempts; that is, the law of Treaties and Constitutional Law supersedes inconsistent state law. In preemption cases the courts must determine whether the Federal law was intended to supplant state, not whether congress has the power to do so. As long as Congress has enacted a law under one of its "Enumerated powers," inconsistent state laws are invalid.

As Chief Justice John Marshall noted in Gibbons v. Ogden (1824), if Federal Law permits an action that state law prohibits, the court must disregard the state law. However, when Federal law does not explicitly say that it supersedes state law and there is no obvious conflict, the court follows certain general principles in deciding whether to give federal law preemptive effect. Nonetheless, the court begins with a presumption that "Congress did not intend to displace state laws." See Maryland v. Louisiana (461 U.S. 725, 1981); and New Mexico v. Mescalero Apache Tribe (462 U.S. 324, 1983).

The test for whether Congress intended to preempt state law stems from whether state policy would produce a result inconsistent with the objective of the Federal law. See Rice v. Santa Fe Elevator (331 U.S. 218, 1947). Even if Congress has not intended to fully displace state regulation of a specific area, state law is preempted to the extent it actually conflicts with the Federal law. See Florida Lime & Avocado Growers, Inc. v. Paul (373 U.S. 132, 1963) and Hines v. Davidowitz (312 U.S. 52, 1941).

Even Municipal Ordinances are preempted. See Lafayette v. Louisiana Power & Light Co. (435 U.S. 389, 1978). Even though the Federal Aeronautics Act did not specifically state that it was preempting all local noise rules, the court held that the safety policies of the

(6) of 9

Federal law require the Federal aviation Administration to have complete authority over take-off and landings, leaving nothing for municipalities to regulate. See. Burbank, City of v. Lockheed Terminal Inc. (411 U.S. 624, 1973).

## EXECUTIVE AND CONGRESSIONAL PLENARY POWERS

The principle of Execute and Congressional Plenary Powers as it relates to Indigenous peoples (so-called Indians) gives to Congress and the President the authority to regulate the affairs of the Indigenous peoples, such as their right to travel abroad.

Forced from their ancestral home lands by U.S. military forces and forced to migrate to the urban center, many Washitaw Muurs have assumed the U.S. and state citizenship. As a result, there has arisen the need to expatriate American nationality and to repatriate Washitaw Nationality, or otherwise be recognized as having a Dual Nationality via non-resident Alien. Because at common law one owes perpetual allegiance to their ancestors and to the land of their birth.

As such, the Washitaw Nation of Muurs are unique people possessing sovereignty over their own person and land. The sovereign status of the Washitaw Nation of Muurs has been diminished by their incorporation into the United States. This practice of becoming U.S. and state citizens has lead to what has been called a "checker board pattern" of American Moors and Indigenous Muurs of Washitaw Nationality.

The lack of an affirmative declaration as to which nationality will compel an act of expatriation for these Muurs removed from U.S. and state jurisdictions. Emphasis is given to "separateness" and domicile statue of Indigenous Peoples under United Nation jurisdiction. Washitaw Muurs retain their sovereignty while relinquishing state and U.S. citizenship. The inherent sovereignty of the Washitaw is NOT incompatible with International and Federal laws.

The Supreme Court has held that Congress holds "unilateral Power" to exercise legislative control over the affairs of Indigenous Peoples, but the executive branch retains the power to regulate the affairs of Indigenous Peoples. That is, Congress or the Executive branch may enact limits on Indigenous Peoples' "Sovereignty" without the consent of Indigenous Peoples. In that regard, Congress has enacted laws authorizing the Bureau of Indian Affairs to administer restrictions on the affairs of Indigenous Peoples that, among other activities, controls their right to travel abroad.

Congressional legislation and Executive regulations define the conditions under which Indigenous Peoples may travel abroad among other matters. Thus, the Supreme Court has upheld the "Plenary Power" of Congress and the President.

## POLITICAL QUESTIONS AND THE COMITY PRINCIPLE

While the traditional home land of the Washitaw had been all of the Louisiana east of the Demarcation Line (1713), the northern half

of the present day Louisiana is acknowledged as the home land of the Washitaw. Although the Washitaw are afforded Federal and International political protection, it has been extremely difficult to get legal protection. The lands of the Washitaw are held in Trust status while the people are given the right to occupy their own land.

The political question doctrine holds that certain actions of Congress and the executive branch are held to be political rather than legal; and that such actions are not questionable under judicial review. The presumption is that both Congress and the Executive branch have "plenary powers" to legislate and regulate affairs of Indigenous Peoples.

As a result, Indigenous Peoples of the Washitaw carry dual identity: One Federal and the other international (tribal or indigenous). The Washitaw are a nation within a Nation; and consequently, they fall under both Federal and international jurisdictions. Hence, the political question doctrine.

Comity is the principle of restraint that steers courts away from cases that might interfere with the authority of other jurisdictions. Federal court "abstention" is the most common modern example of the "comity" principle. After hearing the argument for Washitaw sovereignty on behalf of their heirs of HENRY JOSEPH TURNER? the U.S. Supreme Court of 1848 steered away from the political issue of Spanish Land Grants. As Justice Hugo L. Black noted in Younger v. Harris, (401 U.S. 37, 1971): Comity is

> ...a proper respect for state functions, a recognition of the fact that the entire community is made up of a Union of separate State governments and a continuance of the belief that the National Government will fare best if the States and their institutions are left free to perform their separate functions in their separate ways.

A case within the jurisdiction of the U.S. Supreme Court presented by heir of Henry Joseph Turner against the United States was found with standing, but presenting all the qualifications making it a "controversy". The 1848 court refused to adjudicate. In Marbury v. Madison (1 Cir., 5 U.S. 137, 170, 1803) the court maintained

> The province of the Court is solely to decide on the rights of individuals, not to inquire how the executive, or executive officers, perform duties in which they have discretion. Questions in their nature political...can never be made in court.

The President acting under congressional authorization has exclusive and unreviewable power to determine political questions. Thus, the determination by the President whether to recognize the government of a foreign state or who is the ruler of a foreign state

is conclusive. However, in the absence of a definitive executive action the court will review the record to determine whether the United States has accorded the sufficient degree of recognition to allow the court to take judicial notice of the existence of the state. This the court did in 1848, United States v. Henry Turner Heirs.

Political questions are controversies that the U.S. Supreme court has regarded as non-justiciable and inappropriate for judicial resolution. Although the court may have jurisdiction over cases involving such questions, it has chosen not to decide it, preferring instead to allow it to be resolved by the "political" branches of government.

Although "comity" is not specifically mentioned in the constitution, it is implied under the "Full Faith and Credit Clause." The courts in one state must recognize the judgments of courts in other states. What's more, the "Supremacy Clause" demands that when state and Federal law conflict, the states must bow to the supremacy of Federal law and judicial decisions.

> This Constitution, and the laws of the United
> States which shall be made in pursuance thereof;
> and all treaties made, or which shall be made,
> under the authority of the United States, shall
> be the Supreme law of the land.
> (Article VI, Section 1)

In Gibbons v. Ogden, Chief Justice John Marshall has established that although a state may have the power to pass a certain law, the law has no legal effect if it has conflicts in some way with a law that Congress is likewise empowered to enact. The rule that Federal law is paramount to state law applies not only to all levels of state law, including not only legislative enactments but also state constitutions and judicial opinions.

Federal statues are laws in this sense as are treaties to which the senate has consented. State laws that conflict with Federal treaties or Federal laws implementing those treaties are void Missouri v. Holland, (252 U.S. 416, 1920). Regulations promulgated by Federal "Administrative Agencies" are likewise supreme, and the Court has said that the very existence of a Federal agency's power to regulate, even though unexercised, may indicate that the states must refrain from acting.

THE WASHITAW NATION OF MUURS  having made proof of the genuineness of their U.S. Land Grant #923... Grant under the former Spanish/Moorish Sovereign. The Supreme Court's construction and application of Property Clause [Article IV, clause 2] of the Federal Constitution, confers upon Congress the power to dispose of and make rules and regulations as to, property the United States [49 L Ed 1239, see 63-C Am Jur 2d, Public Land at section 40].

"No public policy of a state can be allowed to override the positive guarantees of the U.S. Constitution" [Article IV, section 4; See 16 Am Jur 2d, Constitution Law, at section 70].

# THE MOORISH SCIENCE TEMPLE OF AMERICA
HOME OFFICE OF NOBLE DREW ALI

9 of 9

RAVANNA SANDERS-●●Y                                  MOORISH SCIE●●E TEMPLE OF AMERICA
                                                     EIN 56–2473981 RELIGIOUS CORPORATION

*Exhibit    A-22*

# APPLICATION FOR RECOGNITION OF EXEMPTION
## UNDER SECTION 501(c)(3) IRC [FORM 1023]
### EXPLAINATION COMPLIMENT

**PART II    ORGANIZING DOCUMENTS**
— Certificate of Incorporation, Illinois Religious Corporation
— Moorish Holy Temple of Science, November 29th 1926
— Moorish Science Temple of America, [name change] August 1st 1928
— Tax Exemption No.: **E 9939–0647–1**, Illinois Department of Revenue
— IRS EIN Identification Number: **56–2473891**, Moorish Science Temple

**PART III    PURPOSE(S)**
— To propagate the faith of the Holy Prophet of Islam, Mohammed; and to extend the faith through the consecration of missionaries;
— To promote the solidarity of Muurs under Ismaili Islam and encourage the development of an economic and social exchange network; and,
— To improve the quality of life and enhance the social development of the Muurs through the cooperation and integration of all local Moorish Temples and their congregations.

**PART IV    NARRATIVE DISCRIPTION**

The infrastructure of the Moorish Science Temple of America is derived from the fraternal lodge system centered around the self-governing Moorish Temple, administered by Moorish Sheiks and Sheikees (priests) who organize volunteer committees that provide the necessary functions of the local temple.

Generally, activity programs are basically aimed at strengthening family values, enhancing family life and providing shared experiences. Activities stress participation in both internal and external affairs so as to provide leadership training. Temple membership is open to Muurs as well as non-Muurs. Temple programs and religious activities vary according to the specific needs and interests of the local temple. Each temple has its own programs, such as Sunday School, Prayer Services, indoor/outdoor recreation for children/youth, and religious forms.

The Moorish Moslem Community is an integrated system of interacting local and regional temples encompassing every aspect of life, spiritual and material. This system is driven by the Moorish Convention Circuit. The economic and social life of the Moorish Moslem Community is dependent upon this system. Annual Moorish Conventions reinforce lines of communication; and as such, they function to enhance the exchange network. During Conventions the Host Temple is obliged to facilitate the ceremonial distribution of gifts, usually in the form of lodging, meals and a verity of other goods and serves.

RAVANNA SANDERS-B●  **MOORISH SCIENC●TEMPLE OF AMERICA**
**EIN 56–2473981 RELIGIOUS CORPORATION**

Local Moorish Temples are autonomous and follow an extreme form of congregational piety. The generosity of its members is anchored in the Moorish Covenant of support for each other. Voluntarism is the rule; and the exchange network is the life–line that provides the recourses required for the survival of the Community.

## PART V    COMPENSATION

Officers and Directors of the Moorish Science Temple of America receive NO salary, wages or fringe benefits. Lodging, meals, travel and/or the use of a vehicle are provided by individual members at their own personal expense. There are No resolutions governing the financial arrangements for compensation, accept that No One is to be paid any money by the Moorish Science Temple of America. This religious corporation assume the "Vow of Poverty," owns No property and does Not engage in commerce. If there is any property in the name of the Moorish Science Temple of America, it is the sole property of Our Lord God and Savior, Allah El. The State of Illinois, or the Moorish Science Temple of America, simply serves as steward of said property; for only Allah has ownership of earthly property. Officers and Directors of the Temple are simply servants of Allah with a commitment to Love, Truth, Peace, Freedom, and Justice.

## PART VI    MEMBERSHIP

Primarily Membership with the Moorish Science Temple are decedents of the Washitaw Nation of Muurs; but there are other Members who have adopted Ismaili Islam and have become Moslems. Muurs and Adopted-Muurs comprise the whole of the Moorish Science Temple of America. The requirements for membership are: **1.)** The Affirmation of the Faith of Mohammed; **2.)** The adoption of the Islamic Creed; and **3.)** The practice of the Five Pillars of Islam. Office holders receive the Title of Sheik or Sheikess. The head of a local temple is called a Sheik. The Supreme Grand Sheik is the head of the National Moorish Science Temple of America located in Chicago, Illinois. The official status of membership is recorded by the National Secretary. The rights and duties of members are expressed in the Pillars of Islam.

## PART VII    HISTORY: MOORISH SCIENCE TEMPLE OF AMERICA

Decedents of the Muurs expelled from Spain resettled among the Washitaw Muurs in North America in the 15th Century. The Muurs were eventually organized by the Holy Prophet Noble Drew Ali in 1913 and incorporated as a religious estate in the State of Illinois in 1926. The name Holy Temple of Science was changed to the Moorish Science Temple of America in 1928. This surviving group of Muurs of the Diaspora were practicing Ismaili and members of this branch of Islam all so known as the Seveners.

RAVANNA  SANDERS–B⬤

**MOORISH  SCIEN⬤TEMPLE OF AMERICA**
**EIN 56–2473981 RELIGIOUS CORPORATION**

Prophet Noble Drew Ali initiated the revival of Ismaili Islam among the Muurs.    In 1913 he proclaimed to be the Mahdi, the promised Messiah predicted by the Holy Prophet of Islam: Mohammed III.    He proclaimed to be the fulfillment of the prophecies announced by all the great faiths.    Ismaili Islam, as proclaimed by Prophet Noble Drew Ali, may be regarded as a science of divine truths.    Like any other science, Ismaili Islam admits to the necessity of observation and reasoning; it is in consonance with human nature.    Accordingly, the object of life is the complete manifest of divinity.    Every human being has within them the essence of perfect development.

## PART VIII  SPECIFIC ACTIVITIES

### 1.    MARRIAGE AND WEDDING CEREMONY

— Birth Transition Ritual

— Purification / Baptism Ritual

— Naming Ritual

### 2.    MEMBERSHIP AND MATURITY CEREMONY

— Rite of Passage Ritual

— Initiation and pledge of Loyalty Ritual

— Acceptance of the Moorish Covenant with God Ritual

### 3.    ANCESTURAL HOMAGE CEREMONY

— Muur's Foundation Day [ January 8th ]

— Days of Epiphany [ June 19th and August 7th ]

### 4.    COMMEMORATION OF THE ELDERS CEREMONY

— Spirit Possession Ritual

— Karma / Reincarnation Ritual

### 5.    DEATH AND FUNERAL CUSTOMS CEREMONY

— Wake and Funeral Procession

— Burial / Cremation Ritual

— Sanctity of Death Celebration

RAVANNA SANDERS-BEY

MOORISH SCIENCE TEMPLE OF AMERICA
EIN 56–2473981 RELIGIOUS CORPORATION

## PART IX    STATEMENT OF REVENUE AND EXPENSES

In the economic sphere Ismaili Islam required the widest and most equitable distribution of wealth [necessary resources] while safeguarding private ownership.    The whole of the Moorish Community is regarded as a trust encompassing a series of exchange networks, where the distribution of resources move freely form one member to another, depending their needs.    The lending of money on interest and the levying of taxes are prohibited.    Member participation in the exchange network is obligatory;   for it insures an adequate minimum of necessities of life for its members.

The economic and social underpinnings of the exchange network are private local accommodation and the Moorish Covenant among members:    the reciprocal obligation of support.    Each member pledge to aid and assist one another and promise to abide by certain stipulations during the Moorish Convention.    The Annual Conventions, comprised of the Host Temple and many Guest Temples, drive the exchange network.    In their turn each Guest Temple will host the Convention.    In this way the Convention moves from one major city to another each year.    The Convention circuit is driven by the competitiveness of the Grand Major Temples, each of which are obliged to host their own Convention and assert their superiority.    Emphases is given to the perpetuation of the exchange network.

At the center of each region, identified by the name of a major city, is a Grand Major Temple whose responsibility it is to support the local temples of that region.    The expenses of each temple are assumed by its members, who organize themselves in to a series of volunteer committees that provide for the necessities of the temple.    There are No membership, admission or service fees. Individual members or volunteer committees absorb the cost for all programs, equipment and furnishings.    At this time, the Moorish Science Temple of America has No property in its name.

Grand Major Temples, also known as regional temples, are associated with the National Supreme Grand Major Temple in Chicago, Illinois.    The Moorish Science Temple of America operates within a barter economy: the direct exchange of goods and services.    The barter economy that supports the Moorish movement does not involve the transference of money, accept at a minimum by small scale vendors and local organic vegetable merchants.    There are No fundraising activities, No loans or mortgage.    The Moorish Science Temple of America has absolutely No liability or assets.

## SUBSCRIBED, SEALED AND AFFIRMED

In Witness whereof, I have hereunto set my hand and caused
the seal of the **Moorish Science Temple of America** to be
affixed, this        Day of        in the Year        .

President,  Sheik Ravanna Sanders–Bey: Moorish Temple of America, Inc.
Witness The Hand And Seal

**MOORISH TEMPLE**    ⬤    **SCHEDULE A: CHURCHE**⬤    **EIN 56–2473981**

## INTRODUCTION:    *Exhibit    A- 23*

The Moorish Science Temple of America is a Religious Corporation established in the State of Illinois, and is seeking Incorporation under 26 U.S.C. § 508(c)(1)(A) and (B) with exemption under both 26 U.S.C. § 508(a) and § 501(c)(3).    Recognition of Exemption under 26 U.S.C. § 508(c)(2) and 26 C.F.R. § 1. 508–1(a)(3) apply, using IRS Form 1023 [26 C.F.R. § 1. 508–1(a)(2)(i)] and serving Notice under 26 C.F.R. § 1. 508–1(a)(2).    The original of the Certificate of Incorporation is held in the Office of the Secretary of State for the State of Illinois [26 CF.R. § 1. 508–3].

Organized and operated ¬under the laws of Illinois as a Religious Corporation, the Moorish Science Temple of America was created by State law in accordance with 26 U.S.C. § 501(c)(27)(B)(i)(d), acknowledging an Integrated Auxiliary [26 C.F.R. § 1. 6033–2(h)(2) and § 1. 6033–2 (g)(ii)].

## SCHEDULE A:    CHURCHES

**1(a)(b)**    In the tradition of Ismaili Islam the call to prayer are three times a day, rather than five: Morning, Afternoon and Evening prayer.    Muurs are required to participate in the Friday Congregational Prayer.    Friday evening prayer is led by an Imam/Moabite, a prayer leader.    This Prayer is associated with certain rituals observed by the faithful.

**4(a)(b)**    Religious Services are conducted daily: afternoon and evening Prayer.    An average number in attendance are between 25 to 40 on any day accept Friday, when there may be as many as 150 devotees.    Prayer is made facing the East, in the direction of Mecca/Jerusalem, while assuming a specified posture.    Prayer banners, rugs or rosary beads may be used during prayer service.

**5(a)(b)**    In the Chicago Metropolitan Area there are Nine (7) independent Moorish Temples under the jurisdiction of the Chicago Regional Temple, which also functions as    Headquarters for the Moorish Science Temple of America and the Supreme Grand Major Temple.    The number in attendance at 2248 West 80th Street, Chicago,  is between 25 to 40 members, accept  on Friday evenings when the number may be as many as 150.

**7**    There are as many as 300,000 Muurs in North America; most of them are concentrated in major metropolitan areas.

**8(a)**    To become a Moslem, an Adherent need only believe and practice the Five Pillars of Islam which are required of every Moslem: Ismaili Islam as well.

1.    The pronouncement of the Confession of faith;
2.    The performance of the required Three (rather than five) daily prayer;
3.    The required fasting during the Eight (rather than ninth) Month: August;
4.    Tribute in the form of community service and participation in the network;
5.    The Pilgrimage to the Holy City of Mecca, Or to Monroe, Louisiana: Home of the Indigenous Washitaw Mound at Poverty Point.

**MOORISH TEMPLE**        **SCHEDULE A: CHURCHE** ●    **EIN 56–2473981**

**2(a)(b)(c)**      This group of Moslems subscribe to an esoteric interpretation of the Qur'an; as such, the code of doctrine and discipline of Ismaili Islam is distinctly influence by Gnosticism and Neoplatonism. Like any other science, Ismaili Islam admits to the necessity of observation and reasoning; it is in consonance with human nature. Accordingly, the object of life is the complete manifest of divinity. Every human being has within them the essence of perfect development.

**14**      The cardinal doctrine of Ismaili Islam is the unity of the Godhead: a Triune Being. "There is no god but One, who necessarily is the source of all that is good. There is none worthy of worship but the One and only God, and Mohammed is His Prophet." The cardinal doctrine of Ismaili Islam is the unity of the Godhead: a Triune Being. "There is no god but One, who necessarily is the source of all that is good. There is none worthy of worship but the One and only God, and Mohammed is His Prophet." Ismaili Islam requires the belief in all the Great Prophets, including Abraham, Moses, Jesus, Krishna, Buddha, Confucius, Zoroaster as well as other divine Avatars. Each one are regarded as divinely inspired for the "regeneration" of humanity; that humanity will stay the course toward divinity. Ismaili Islam requires peace between all religions, and regard the adherents of each as "People of the Book" [Arabic, ahl al-Kitab].

**6**      Adherents of Ismaili Islam draw no line of discrimination, but simply maintain that the Holy Prophet Mohammed was also a Great Prophet of God. Our own age has not been without its own witness to God's inspiration. While we consider the Holy Prophet Mohammed as the Seal of the Prophets, Our Holy Prophet Noble Drew Ali is regarded as Prophet Mohammed "Reincarnate." Prophet Noble Drew Ali is our witness. Although the Holy Qur'an is the sacred Scripture for all Moslems, the Muurs of North America have their own sacred Scripture: The Holy Koran written by our Prophet Noble Drew Ali. Nonetheless, the Muurs are encouraged to read any of the other sacred Scripture. Their divined revelation gives guidance for all humanity, providing standards for good conduct. Every kind of injury against our fellow beings are forbidden; for each one of us are enjoined in benevolence and generosity towards one another.

**3**      **RELIGIOUS HIERARCHY OR ECCLESLASTICAL GOVERMENT**

     The Moorish Science Temple of America is a Moslem Sheikdom that subscribes to the authority of the defunct Fatimid Caliphate and that descends from the First Sharifian Sultanate [Saadian, 1554-1660] of Morocco. The present Moorish Sheikdom hierarchy [ecclesiastical government] consist of the following structure:

**EXECUTIVE: PRESIDENCY**

     Supreme Grand Sheik --- Head of National Moorish Science Temple
     Grand Sheik        — Head of a Regional Moorish Science Temple
     Sheik              —- Head of a Local Moorish Science Temple

**MOORISH TEMPLE**  **SCHEDULE A: CHURCHE** ⬤ **EIN 56–2473981**

## JUDICIARY:

Supreme Grand Qadi — Chief Justice among Five Associates [National]
Grand Qadi — Chief Judge among Three Assistants [Regional]
Qadi — Constable, Magistrate [Local Sheriff]

## LEGISLATIVE:

Chairman/Governor of the Board of Grand Sheiks/Governors [Upper House]
Director/Mayor of the Counsel of Sheiks/Aldermen [Lower House]
Administrator/Manager/Sheik of the Local Moorish Temple

## SECURITY: LAW ENFORCEMENT

Supreme Grand Mufti — Head of National Security
Grand Mufti — Head of Regional Security
Mufti — Head of Local Security

## SUBSCRIBED, SEALED AND AFFIRMED

In Witness whereof, I have hereunto set my hand and caused
the seal of the **Moorish Science Temple of America, Inc.** to be
affixed, this      Day of      in the Year      .

President, Sheik Ravanna Sanders-Bey: Moorish Temple of America. Inc.
Witness The Hand And Seal

MOORISH SCIENCE TEMPLE          **SCHEDULE E**                    EIN 56–2473981

*Exhibit   A-24*

## ORGANIZATION NOT FILING FORM 1023 WITHIN 27 MONTHS OF FORMATION

**RELIGIOUS PURPOSES ONLY:**

The Moorish Science Temple of America is a Religious Corporation and is not organized for the private gain of any person.   It is organized under the Nonprofit Religious Corporation Law of the State of Illinois in 1926 exclusively for religious **purposes:**

— To propagate the faith of the Holy Prophet of Islam, Mohammed; and to extend the faith through the consecration of missionaries;
— To promote the solidarity of Muurs under Ismaili Islam and encourage the development of an economic and social exchange network; and,
— To improve the quality of life and enhance the social development of the Muurs through the cooperation and integration of all local Moorish Temples and their congregations.

## NO POLITICAL CAMPAIGNING, INFLUENCE LEGISLATION, ETC.

This corporation is organized and operated exclusively for religious purposes  within the meaning of Section 501(c)(3), Internal Revenue Code.

No substantial part of the activities of this corporation shall consist of carrying on propaganda, or otherwise attempting to influence legislation; and the corporation shall not participate or intervene in any political campaign (including the publishing or distribution of statements) on behalf of any candidate for public office.

## DISSOLUTION CLAUSE

The property of this corporation is irrevocably dedicated to religious purposes and no part of the net income or assets of this corporation shall ever inure to the benefit of any director, officer or member thereof or to the benefit of any private person.   Upon the dissolution of the corporation, its assets remaining after payment, or provision for payment of all debts and liabilities of this corporation shall be distributed to a nonprofit fund, foundation or corporation which is organized and operated exclusively for religious purposes and which has established its tax exempt status under Section 501(c)(3), Internal Revenue Code.

## CONFLICT OF INTEREST POLICY

Be advised: This corporation adopts the "Conflict of Interest Policy" from Appendix A and published in the IRS Application for Recognition of Exemption, Package 1023 (Rev. Oct. 2004).

## SUBSCRIBED, SEALED AND AFFIRMED

In Witness whereof, I have hereunto set my hand and caused the seal of the **Moorish Science Temple of America** to be affixed, this       Day of        in the Year       .

President, Sheik  Ravanna Sanders–Bey: Moorish Temple of America, Inc.
Witness The Hand And Seal

RAVANNA SANDERS–BEY                                                    Monday, April 16, 2007

COMMITTED PERSON'S GRIEVANCE

**Date:** 17 August 2006    Committed Person: Rickey Robinson-El    K82958

**Present Facility:** Stateville Correctional Center    **Facility where grievance issue occurred:** Stateville Correctional Center

**NATURE OF GRIEVANCE:**

- [ ] Personal Property
- [ ] Staff Conduct
- [ ] Transfer Denial by Facility
- [ ] Mail Handling
- [ ] Dietary
- [ ] Transfer Denial by Transfer Coordinator
- [ ] Restoration of Good Time
- [ ] Medical Treatment
- [ ] Disability
- [x] Other (specify): Grooming Policy
- [ ] Disciplinary Report _____ / _____ / _____
  Date of Report    Facility where issued

RECEIVED
SEP 07 2006
Grooming Policy
GTA #: 1203

**Note:** Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification.

**Complete:** Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

**Brief Summary of Grievance:** I am a Washitaw Muur (moorish) American Native to this land.

I participate in my Nation's cultural, social, and religious affairs. One tenet

of my religious faith teaches that locks symbolizes and embodies the strength

a person acquires during his spiritual journey to overcome and conquer one's

~~a person acquires during his spiritual journey to overcome and conquer one's~~

lower nature which is native to the physical world. In keeping with my re-

religion/spirituality, I maintain my hair/dreadlocks like a Lion in Zion

because I believe that cutting my hair will cost me my strength and allow the

lower nature to conquer & condemn me to the physical world for all eternity.

   Due to Warden's and other administrators having the discretion to re-

quire a committed person to abide by an individual grooming policy, absent ⟶

**Relief Requested:** That my rights be upheld by permitting a religious exception to

Warden's Bulletin:02.60" and the discretion to IDOC's Grooming Policy

held by Warden's etc, not limited to transfer's & Writs.

[x] Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

Rickey Robinson-El without recourse    K82958    8/17/06
Committed Person's Signature  UCC 1-207 & 1-103.6    ID    Date

(Continue on reverse side if necessary)

---

**Counselor's Response (if applicable)**

**Date Received:** 8 / 22 / 06

- [ ] Send directly to Grievance Officer
- [ ] Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277

**Response:** It is true that the Individual Grooming Policy (Warden's Bulletin # 02-60)

does not take religious affiliation into account. This is a maximum-security facility, and

security will always be a priority. However, as things are done concerning this policy, it

appears that only minority offenders are targeted, especially those with locks. This

needs to be addressed.

L. Dennis    [signature] Dennis    8 / 27 / 06
Print Counselor's Name    Counselor's Signature    Date of Response

---

**EMERGENCY REVIEW**

**Date Received:** _____ / _____ / _____

Is this determined to be of an emergency nature?

- [ ] Yes: expedite emergency grievance
- [ ] No; an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

_____    _____ / _____ / _____
Chief Administrative Officer's Signature    Date

any security risk or conspiratorial security risk I grieve that my rights will be violated and I will suffer irreparable injury if my hair is cut! I wish to protect my right to exercise my religious belief.

It is at the Warden's & Administrators discretion to require an inmate to abide by an "individual grooming policy based on what they deem to be a security risk. IDOC fails to discuss whether it considers religious exception to policy.

Illinois Department of Corrections enforcing grooming policy requiring me to cut my hair, notwithstanding that I show no signs of or give the presumption of a security risk, I move to prevent IDOC and it's agents from compelling a false interest in security that does not exist.

It has always been IDOC's requirement to forcefully remove dreadlocks upon writs & Transfers with no respect to one's religious rights secured by the constitution. This raises a concern, juxtaposed with my informed knowledge by a reliable source in confidence; that with the new Warden & Deputy Director, the order has come down to the tactical team that from here on out, committed person's with dreadlocks when asked to take them down (knowing it is an order that one with locks are not able to comply with), forcefully remove them when they do not comply.

The grooming policy of Illinois Department of Corrections (IDOC) as interpreted by it's administration, requiring inmates to cut their dreadlocks, without a religious exception, imposes substantial burden on my Native/Indigenous American religious practice within meaning of "Religious Land Use and Institutionalized Persons Act (RLUIPA).

The loss of first Amendment freedoms, for even minimal periods of time, constitutes irreparable injury. Respectfully, I refuse to adhere to the interpretation to the grooming policy because of my sincere religious belief that I may only cut my hair upon the completion of my Nazarene vowel (elevation to a certain spiritual level) or the abandonment of said vowel (my spiritual journey) IDOC's refusal to permit a religious exception, violates my religious freedom. With respect to IDOC's policy I have always and will submit to the shakedown of my hair.

NOTICE TO AGENT IS NOTICE TO PRINCIPAL, NOTICE TO PRINCIPAL IS NOTICE TO AGENT

*Rickey Robinson-El (without Recourse)*
*UCC 1-207 & UCC 1-103.6*
*17 August 2006*

*2 of 2*

*Exhibit B-2*

May 16, 2002

WARDEN'S BULLETIN #: ___02-60___

TO:         ALL STAFF

RE:         <u>INDIVIDUAL GROOMING POLICY</u>

Department Rule 502B allows for the imposition of an individual grooming policy when an inmate's hairstyle (including facial hair) creates a security risk or health or sanitation problem. In accordance with this rule, an individual grooming requirement may be imposed on those inmates who continuously change their appearance and thereby interfere with the orderly function of the facility or on inmates who maintain their hair (including facial hair) in the following manner:

- hairstyles that may signify with security threat groups, including but not limited to initials, symbols, multiple parts, hair disproportionately longer in one area than another (excluding natural baldness);
- hair that poses a health or sanitation problem;
- hairstyles that create a risk that contraband hidden in the hair cannot be detected or that impede the searches for contraband or that pose a risk that contraband hidden in the hair may injure and employee searching him.

Those inmates who maintain their hair in any of the above manners and who refuse to comply with an order to either undo the hairstyle or to submit to a haircut may be subject to disciplinary action and, if necessary, forcibly changing the hairstyle.

Kenneth R. Briley, Warden
Stateville Correctional Center

## Grievance Officer's Report

**Date Received:** September 7, 2006     **Date of Review:** September 7, 2006     **Grievance #** (optional): 1208

**Committed Person:** Rickey Robinson     **ID#:** K82958

**Nature of Grievance:** Other-Grooming Policy

**Facts Reviewed:** Grievant alleges that because he is a Washitaw Muur (Moorish) American native to this land, his faith includes locks. Grievant states he wishes to exercise his right to religious beliefs.

Counselor states it is true that the individual grooming policy (Warden's Bulletin # 02-60) does not take religious affiliation into account. This is a maximum security facility and security will always be a priority. However, as things are done concerning this policy, it appears that only minority offenders are targeted especially those with locks. This needs to be addressed.

**Recommendation:** This Grievance Office does not concur with counselor response, as the hairdo named "locks" is not limited to and being worn by only minorities. Due to the safety and security and including sanitation of institution, dreadlocks are not permitted regardless of sex, religion, race, or ethnicity. Grievance is denied.

Ami Workman
Print Grievance Officer's Name     Grievance Officer's Signature

(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

## Chief Administrative Officer's Response

**Date Received:** 9-13-06    ☒ I concur    ☐ I do not concur    ☐ Remand

**Comments**

W. McCann
Chief Administrative Officer's Signature     9-13-06
Date

## Committed Person's Appeal To The Director

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

Rickey Robinson-El without Recourse    K82958    9-18-06
Committed Person's Signature   DOC 1-227; 1-185.6    ID#    Date

*Exhibit B-4*



**Illinois**
**Department of**
**Corrections**

**Rod R. Blagojevich**
Governor

**Roger E. Walker Jr.**
Director

1301 Concordia Court / P.O. Box 19277/ Springfield, IL 62794-9277 / Telephone: (217) 522-2666 / TDD: (800) 526-0844

January 2, 2007

Rickey Robinson
Register No. K82958
Stateville Correctional Center

Dear Mr. Robinson:

This is in response to your grievance received on September 20, 2006, regarding security (grooming, regarding hair styles unable to be searched), which was alleged to have occurred at Stateville Correctional Center. This office has determined the issue will be addressed without a formal hearing.

The Grievance officer's report, 1208, and subsequent recommendation dated September 7, 2006 and approval by the Chief Administrative Officer on September 13, 2006 have been reviewed.

Based on a total review of all available information, it is the opinion of this office that the issue was appropriately addressed by the institutional administration. It is, therefore, recommended the grievance be denied.

FOR THE BOARD: _____
Melody J. Ford
Administrative Review Board
Office of Inmate Issues

CONCURRED: _____
Roger E. Walker Jr.
Director

cc:    Warden Terry McCann, Stateville Correctional Center
       Rickey Robinson, Register No. K82958
       Chron. File

Exhibit B-3

Rickey Robinson El
Resident #K82958
c/o: P.O. Box 112
Joliet, Washitaw Province
Illinois Republic
[Via: u.s.A. Postal Zone 60434-0112]

20 September 2006

Roger E. Walker Jr. - Director
Illinois Department of Corrections
P.O. Box 19277
Springfield, Illinois
Via: u.s.A. postal zone 62794-9277


Dear Mr. Walker,
    I come in peace with this letter as I serve you legal notice
that I am an indigenous individual currently held at Stateville
Correctional Center and due to the broad and vague grooming
policy that is currently in place 'Warden McCann' refuses to
consider a religious exception. Mr Walker if Warden McCann
authorizes his employees to forcfully remove (cut) my hair do
understand that my hair is private property under **Copyright of
trade-mark/trade-name** <u>RICKY ROBINSON-EL</u>, and is filed with the
UCC Division/Secretary of State Illinois Republic or soon to be
filed.

    All rights reserved regarding common-law copyright of trade-
name/trade-marks **RICKY ROBINSON EL**, as well as any and all
derivatives and variations in the spelling of any of said trade-
names/trade-marks, not excluding "Ricky Robinson El," Common Law
Copyright **1970**, 2006 respectively, by **Ricky Robinson El**. Written
consent and acknowledgment of **Ricky Robinson El** as signified by
the signature of **Ricky Robinson**, is known as the "Secured Party"
and "Holder In Due Course." The Secured Party neither grants, nor
implies, nor otherwise gives consent for any unauthorized use of
any of **RICKY ROBINSON EL**, and all such unauthorized use is
strictly prohibited.

    I do not and will not give the consent for the unauthoriza-
tion to cut my property (hair). I ask that you offer your
authority to assert a religious exception to the cutting of
dreadlocks or temporarily place a hold on the removal until this
matter is resolved in court. I also ask that during this period
of restraint (shall you decide to issue such order) you also
restrain your officials/agents/employees/administrators from use
of any and all retaliatory practices. I do understand that shall
any committed person try to conceal anything in their hair or

lacks in the keeping of their hygiene this order shall not apply!

I am enclosing a copy of Grievance Officer's Report, My grievance and Warden's Bulletin 02-60 that you may understand my position better. I am also attaching a 3-page measure that I prepared for you June 9th of 2006. Last but not least a 1-page document is also enclosed, on the front- Certificate Of Title, Declaration And Acceptance Of Title & Pledge Of Allegiance. On the back- Declaration Of Nationality etc.

**NOTICE TO PRINCIPAL IS NOTICE TO AGENT, NOTICE TO AGENT IS NOTICE TO PRINCIPAL.**

With explicit reservation of all Human, Indigenous and Other Rights; Without Prejudice and With Honour: UCC 1-207 & 1-103.6,

_Rickey Robinson El_ Indigenous Washitaw citizen
Resident #K82958
c/o: Post Office Box 112
Joliet, Illinois Republic
[Via: u.s.A. postal zone 60434-0112]

**Certificate and Asseveration:** Status of signer is that of Indigenous People and is not a United States "resident" or "citizen". Therefore, the signer is an exempt foreign individual as noted in the instructions above. The signer is competent and have personal knowledge of the foregoing; therefore the signer states the foregoing to be **true and correct to the best of his knowledge.**

We, the undersigned, witness this day that the one known to us be the signatory did personally appear before us in __WILL__ county and upon affirmation did execute and affix the above signature and seal hereto.

_____ Natural Private Citizen.

_____ Natural Private Citizen.

I, Rickey Robinson-El, state that I served a copy of this Letter/Notice to which this affidavit is attached upon IDOC Director Roger Walker by enclosing the same ia a unsealed envelope plainly addressed on page one of this document by depositing said envelope in the hands of prison official designated for United States Mail at Stateville Correctional Center, Joliet, Illinois, on this _21st_ day of _September_ 2006.

_Rickey Robinson El_
Rickey Robinson El, Without Recourse
UCC 1-207 & 1-103.6

Exhibit B-6

### Empire Washitaw de Dugdahmoundyah
### Indigenous Peoples Nation, U.N. No. 215/93

Date: Thursday June 9,2006

To: Roger E. Walker Jr. - Director
Illinois Department of Corrections

P.O. Box 19277

Springfield, Illinois

Via: u.s.A. postal zone 62794-9277

Empire Washitaw de Dugdahmoundyah


To whom it may concern:

I, Rickey Robinson-El, declare that I am a free and sovereign individual of this land of the ancient mound builders, known by its indigenous name Empire Washitaw de Dugdahmoundyah. I willingly and knowingly exercise my right to a nationality as a member of the indigenous Emperial Washitaw Nation of the Empire Washitaw de Dugdahmoundyah. I further reserve all of the fundamental freedoms and God-given rights of every human being upon this earth. Any and all, past and present political affiliations implied by operation of law or otherwise with foreign entities are hereby, now and forever, dissolved and revoked. Signed and witnesses this ninth day of JUNE,2006.

Per: UNITED NTIONS COMMISSIONER FOR HUMAN RIGHTS United Nations Declaration On The Rights Of Indigenous Peoples, Sub-Commission Resolution 1994/45

"Part 1, Article 5 Every indigenous individual has the right to a nationality".

"Part ii, Article 9 Indigenous peoples and individuals have the right to belong to an indigenous community or nation, in accordance with the traditions and customs of the community or nation concerned. No disadvantage of any kind may arise from the exercise of such a right".

Our sovereignty is through Our hereditary Empresses.

The Empire Washitaw de Dugdahmoundyah has a fully functional Government.

"Part V, Article 19 Indigenous peoples have the right to participate fully, if they so choose, at all levels of decision-making in matters which may affect their rights, lives and destinies through representatives chosen by themselves in accordance with their own procedures, as well as to maintain and develop their own indigenous decision-making institutions".

"Part V, Article 20 Indigenous peoples have the right to participate fully, if they so choose, through procedures determined by them, in devising legislative and administrative measures that may affect them".

"Part V, Article 21 Indigenous peoples have the right to maintain and develop their political, economic and social systems, to be secure in the enjoyment of their own means of subsistence and development, and to engage freely in all their traditional and other economic activities. Indigenous peoples who have been deprived of their means of subsistence and development are entitled to just and fair compensation."

"Part VII, Article 31 Indigenous peoples, as a specific form of exercising their right to self determination, have the right to autonomy or self-government in matters related to their internal and local affairs, including culture, religion, education, information, media, health, housing, employment, social welfare, economic activities, land and resources management, enviroment and entry by non-members, as well as ways and means for financing these autonomous functions."

"Part VII, Article 32 Indigenous peoples have the collective right to determine their own citizenship in accordance with their customs and traditions. Indigenous citizenship does not impair the right of indigenous individuals to obtain citizenship of the States in which they live."

"Part VII, Article 33 Indigenous peoples have the right to promote, develop and maintain their institutional structures and their distinctive juridical customs, traditions, procedures and practices, in accordance with internationally recognized human rights standards."

"Part VII, Article 36 Indigenous peoples have the right to the rcognition, observance and enforcement of treaties, agreements and other constructive arrangements concluded with States or their successors, according to their original spirit and intent, and to have States honour and respect such treaties, agreements and other constructive arrangements. Conflicts and disputes which cannot otherwise be settled should be submitted to competent international bodies agreed to by all parties concerned."

"Part VIII, Article 37 States shall take effective and appropiate measures, in consultation with the indigenous peoples concerned, to give full effect to the provisions of this Declaration. The rights herein shall be adopted and included in national legislation in such manner that indigenous peoples can avail themselves of such rights in practice."

We as indigenous people are Non Tax Payers and Non Taxpayers to any government foreign to Our own and or any foreign corporation. We have Our own transportation Rights and Laws. We have Absolute Titles to Our conveyances and other personal and private property. We provide living birth records for all Our indigenous people.

## Please do not confuse the Washitaw Nation with other pseudo entities!

We are not here to overthrow any other Government or corporate entity.
We are not here to establish any cults, nor any religious institution.
We are not a corporation.
We are not here to harbor any unmoral characters.
We are not here to hide or conceal any fugitives.
~~We are not here to escape any lawful responsibilities.~~
We are not offering Diplomatic Immunity to the Law.
We are not offering Limited Liability options.

The Emperial Washitaw Nation is a Nation governed by its own Laws. We exist and are governed by Our own Sovereign Government. The Empire Washitaw de Dugdahmoundyah has its own Court system for Indigenous People; and we accept no judgement from any other nation or corporation without due process of Our Emperial Courts. We fly Our own Emperial National Flag.

We give credence to Our Creator, Our Empress and to all others under the Emperial Seal of Love, which is strengthened by Truth, Peace, Freedom and Justice. For the record, let it be known that, even as Our Empire has been here for over 11,500 years, so I do now in this year of Our Empress of Empire Washitaw de Dugdahmoundyah, I re-affirm My Sovereign Emperial Washitaw Nation and Our beingness as an indigenous Washitaw citizen.

With explicit reservation of all human, Indigenous and Other Rights; Without Prejudice and With Honour: UCC-1-207 and UCC-1403.6

/s/ *Ricky Robinson-El* : indigenous Washitaw citizen

8707 South Colfax avenue

Chicago, Illinois Republic

[Via: u.s.A. postal zone 60617-2434]

Empire Washitaw de Dugdahmoundyah

We, the undersigned indigenous individuals and residents of Empire Washitaw de Dugdahmoundyah do hereby witness the above signature of one of our own, so signed in Joliet, Illinois Republic, Empire Washitaw de Dugdahmoundyah.

*Israel Ruiz 9/2/06* , indigenous individual

*Jason Taylor 8/9/06* indigenous individual

*Jeffery Carmichael Bey 8/2/06* , indigenous individual

Exhibit B-7

## PROOF/CERTIFICATE OF SERVICE

To: Administrative Review Board

P.O. Box 19277

Springfield, Illinois

62794-9277

PLEASE TAKE NOTICE that on September 18, 2006, I have placed the documents listed below in the institutional mail at Stateville Correctional Center, properly addressed to the party listed above for mailing through the United States Postal Service: Grievance Officer's Report #1208, Grievance (#1208), and an attached Warden's Bulletin (# 02-60).

Pursuant to 28 USC 1746, 18 USC 1621 or 735 ILCS 5/1-109, I declare, under penalty of perjury, that I am a named party in the above action, that I have read the above documents, and that the information contained therein is true and correct to the best of my knowledge.

DATE: 9/18/2006

/s/ Mickey Robinson-El

NAME: Mickey Robinson El

IDOC#: K82958

Stateville Correctional Center

P.O. BOX 112

Joliet, Illinois 60434-0112

Exhibit B-8



**Illinois**
**Department of**
**Corrections**

Rod R. Blagojevich
Governor

Roger E. Walker Jr.
Director

1301 Concordia Court / P.O. Box 19277/ Springfield, IL 62794-9277 / Telephone: (217) 522-2666 / TDD: (800) 526-0844

January 25, 2007

Rickey Robinson
Register No. K89258  K82958
Stateville Correctional Center

Dear Mr. Robinson:

This is in response to your grievance received on September 26, 2006, regarding conditions (grooming policy, security procedures do not allow dredlocks that can not be searched), which was alleged to have occurred at Stateville Correctional Center. This office has determined the issue will be addressed without a formal hearing.

The Grievance officer's report, 1208, and subsequent recommendation dated September 7, 2006 and approval by the Chief Administrative Officer on September 13, 2006 have been reviewed.

Based on a total review of all available information, it is the opinion of this office that the issue was appropriately addressed by the institutional administration. It is, therefore, recommended the grievance be denied.

FOR THE BOARD: _____
Melody J. Ford
Administrative Review Board
Office of Inmate Issues

CONCURRED: _____
Roger E. Walker Jr.
Director

cc:   Warden Terry McCann, Stateville Correctional Center
      Rickey Robinson, Register No. K89258
      Chron. File

| | | | |
|---|---|---|---|

Date: 11 July 2007  Offender (Please Print): Rickey Robinson-El Jr  ID# K82958

Present Facility: Stateville C.C.  Facility where grievance issue occurred: Stateville C.C.

**NATURE OF GRIEVANCE**

☐ Personal Property ☐ Mail Handling ☐ Restoration of Good Time ☐ Disability
☐ Staff Conduct ☐ Dietary ☐ Medical Treatment ☐ HIPAA
☐ Transfer Denial by Facility ☐ Transfer Denial by Transfer Coordinator ☑ Other spec: Religious Grievance / Discrimination
☐ Disciplinary Report ___/___/___ Date of Report  Facility where issued

AUG 0 8 2007  STA C427

Note: Protective Custody Denials may be grieved immediately via the local administration on the protective custody status notification

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:
Counselor, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board
Grievance Officer, only if the issue involves discipline at the present facility or issue not resolved by Counselor
Chief Administrative Officer, only if EMERGENCY grievance.
Administrative Review Board, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer

Brief Summary of Grievance: As a means of exhausting my Administrative Remedies, I, Rickey Robinson-El Jr, bring forth Redress via Grievance for the Civil Rights violations occuring on myself and others similarly situated in Stateville Correctional Center & Prisons throughout the Illinois State who are members of the Washitaw Nation of Muurs. The violations focused on in this grievance is met by "discrimination supported by State action" enforced by State officials and employees "under color of State law", "deprivation of rights", "free exercise of religion", "equal protection of the laws" among other constitutional 7

Relief Requested: Grievant, a member and Representative of the Washitaw Nation of Muurs, request recognition of Ismaili Islam-Beliefs & practices not limited to meeting space & time.

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self

Rickey Robinson-El /s/ Without Recourse  K82958  7/11/2007

**Counselor's Response (if applicable)**

Date Received: 7/12/07  ☐ Send directly to Grievance Officer  ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277 Springfield, IL 62794-9277

Response: On 8/2/07, Chaplain Adamson responded to this grievance by reiterating the Administrative Directive — Committed persons requesting religious activities of the type not offered by the Department shall submit a written request to the facility chaplain and shall be required, if requested by the facility chaplain or the Religious Practice Advisory Board, to submit the following information:

C. Downs  8/2/07

**EMERGENCY REVIEW**

Date Received: ___  Is this determined to be of an emergency nature? ☐ Yes, expedite emergency grievance ☐ No, an emergency is not substantiated. Offender should submit this grievance in the normal manner



Violations per I.D.O.C. Policy Directive.

On June 14, 2007 a letter requesting "Recognition of Ismaili Islam - Beliefs & Practices, Particularly "Meeting space for religious services" was prepared by myself and mailed to the "Chief Administrative Officer" with a copy mailed to "Senior Chaplain "George Adamson". Their silence were established as a Dishonor/Denial of my offer/request. (See attached copy of letter)

Grievant Rickey Robinson El, and Jason Taylor El, and all others similarly situated, are, and were, at all material times, citizens of the Washitaw Nation of Muurs, a foreign state, and are residents thereof. As "U.S. Non-citizen nationals" of an Indigenous/Indian nation, Grievant is "domicile" in the Illinois Republic (Article IV, section 4, of the U.S. Constitution); but at no material times were Grievant a citizen or resident of the State of Illinois (an artificial entity) or the United States, Inc.

Civil right laws are held to apply to "State actions" because the actions of the State's departments stem from the State's "delegation of authority." It is the State itself that creates the power of the "actor" (IDOC officers and Employees) in the name of the department (IDOC); and this fact is that which provides the remedy for redressing the abuses of authority by the State's departments or their employees. The entire function of the Illinois Department of Corrections (IDOC) is subject to the constitutional duties owed to its prison inmates. When a forum is not open to a particular group of inmates, such as the forum for the "exercise of religion", then the IDOC administrative process is malfunctioning; and therefore, the district court must intervene. When there is hostility toward the "religion" and/or "nationality" of a particular group of inmates, to which the Grievant belong, discrimination occurs; and when the administration denies "equal protection of the laws," it practices discrimination as well.

With the above stated, it is my hopes that on some level or another Grievant is provided remedy by reform to I.D.O.C. Policy Directive, that it may discontinue to deny "equal protection of laws" & practices of discrimination.

( Exhibit ● C- 2 )

From: Brother Rickey Robinson-El            Date: June *14*, 2007
      #K82958, B-227

  To: Terry L. McCann, Warden
      George Adamson, Chaplain
      Stateville Correctional Center


RE: <u>Recognition of Ismaili Islam - Beliefs & Practices
    Per...I.D.O.C. Policy Directive</u>.

Islam! (Greetings of Peace)

     On behalf of the Moorish Science Temple of America, Inc., Reincarnate
Temple System, I, present to you an official Request for Recognition of
Ismaili Islam belief and practices. In addition, We request space and time,
for Our group to Pray, Worship and conduct Religious services for greater
Spiritual enlightenment and guidance.

ARTICLE I
<u>Ismaili Islam - ORIGIN</u>

     We are the Sab'iya ["Sevener's"], followers of the First Seven Imams,
decendents of <u>Ali</u> and <u>Fatima</u>, a daughter of the <u>Prophet Muhammad</u> [d. 572 A.D.]
We are the representatives of the <u>Ismaili</u> ["Sevener's"] branch of <u>Sha'Islam</u>,
decendants of:

1.)  The <u>Fatimid Dynasty of Egypt and North Africa</u> [909 - 1171],
2.)  The <u>Almoravids</u> [1056-1147], <u>Almohads</u> [1130-1269], & <u>Marinids</u> [1196-1549]
     of <u>Morocco</u>, as well as
3.)  The <u>Sheriff Dynasty</u> [1511-1927] <u>of Morocco</u>, and
4.)  The <u>Washitaw/Delaware Dynasty(ies)</u> [1511-1683-1778/1797 - present] <u>of
     North America</u>.

     Decendants of the Muurs expelled from Spain resettled among the Washitaw
Muurs in North America in the 15th Century. The Muurs were eventually organized
by the holy Prophet Noble Drew Ali in 1913, and incorporated as a religious
estate in the State of Illinois in 1926. The surviving group of Muurs/Moors of
the Diaspora were practicing Ismaili and members of this branch of Islam, is
also known as the Seveners. Prophet Noble Drew Ali initiated the revival of
Ismaili Islam among the Muurs/Moors. In 1913 he proclaimed to be the Mahdi,
the promised Messiah predicted by the Holy Prophet of Islam: Mohammed III. He
proclaimed to be the fulfillment of the prophecies announced by the great
faiths. Adherents of Ismaili Islam §ß subscribe to an esoteric interpretation
of the Qur'an; as such, the code of doctrine and discipline of Ismaili Islam
is distinctly influenced by Gnosticism and Neoplatonism. Like any other science,
Ismaili Islam admits to the necessity of observation and reasoning; it is in
consonance with human nature. Accordingly, the object of life is the complete
manifest of divinity. Every human being has within them the essence of perfect
development.

[1 of 5]

ARTICLE II

BELIEF AND PRACTICE

The cardinal doctrine of Ismaili is the unity of the Goghead; a Triune Being. "There is no god but One, who necessarily is the source of all that is good. There is none worthy but the One and only Great God, and Mohammed is His Prophet." Ismaili Islam requires belief in all the great Prophets, including Abraham, Moses, Jesus, Krishna, Buddha, Confucious, Zoroaster as well as other divine Avatars. Each one are regarded as divinely inspired for the "regeneration" of humanity; that humanity will stay the course toward divinity. Ismaili Islam requires peace between all religions, and regard the adherents of each as "People of the Book" [Arabic, ahl al-Kitab].

Adherents of Ismaili Islam draw no lines of discrimination, but simply maintain that the Holy Prophet Mohammed was also a Great Prophet of God. Our own age has not been without its own witness to God's inspiration. While we consider the Holy Prophet Mohammed as the Seal of the Prophets, Our Holy Prophet Noble Drew Ali is regarded as Prophet Mohammed "Reincarnated". Prophet Noble Drew Ali is our witness. Although the Holy Qur'an is the sacred Scripture for all Moslems, the Muurs of North America have our own sacred Scripture: The Holy Koran written by our Prophet Noble Drew Ali. Nontheless, the Muurs are encouraged to read any of the other sacred Scripture. Their divine revelation gives guidance for all humanity, providing standards for good conduct. Every kind of injury against our fellow beings are forbidden; for each one of us are enjoined in benevolence and generosity towards one another.

ARTICLE III

CUSTOM:

We Moslems, believe and practice the Five Pillars of Islam which are required of every Moslem: Ismaili Islam as well.

[1]  The pronouncement of the Confession of faith;
[2]  The performance of the required Three (rather than five) daily prayers;
[3]  The required fasting during the Eighth (rather than ninth) Month: August;
[4]  Tribute in the form of community service and participation in the network
[5]  The Pilgrimage to the Holy City of Mecca, Or to Monroe, Louisiana: Home of the Indigenous Washitaw Mound at Poverty Point.

In the tradition of Ismaili Islam the call to prayer are three times a day: Morning, Afternoon and Evening prayer. Muurs are required to participate in the Friday Congretional Prayer. Friday evening prayer is led by an Imam/Moabite, a prayer leader. This is associated with certain rituals observed by the faithful.

Our articles of "Faith and Recognition" are:

Prayer banners, rugs or rosary beads may be used during prayer service.

[2 of 5]

One Red or Black fez for men
One fez bag for men
One turban for women (no longer than 9'x10")
One Blue 1" lapel pin
One White or Blue Allah, Circle, Seven charm to be worn around the neck.
One Certificate Declaration of Nationality

In the practice of Ismaili/Moorish Islam, adherents:

(1) Adhere to the Five Pillars of Islam.

(2) Heed to the clean, pure and lawful diet as prescribed by the true and divine founders of the first religious creed, for the redemption and salvation of mankind on earth. The body is sacred and deserving of clean, pure and lawful foods, such as: "Fish, vegetables, rice, beans, nuts, fresh fruit, and items made from soy and rice milk."

(3) Reverently adorn sacred emblems such as the Fezes worn by Our Brother's, and the Turban's by Our Sister's, keeping all Moslems mindful of the Ever Present Eternal Great God, Allah. ⬛ We wear the "Crescent and Star" button/pin, and the "Allah, Circle, Seven" charm around Our neck and near to Our heart, giving Honor's to Our Great Mother ELOHIM, who has created everything that ever was or is, in heaven and on earth. By One Divine Act She filled the universe with manifest, Stars, Planets and all forms of life.

ARTICLE IV

AUTHORITY

The Moorish Temple of Science, organized in the year of 1925, and was legally incorporated as a civic organization under the laws of the State of Illinois, November 29th, 1926...Certificate #10580. The name Moorish Temple of Science was changed to the Moorish Science Temple of America, May 2nd, 1928, and this change was recorded and filed on May 21st, 1928, in accordance with the legal requirements of the Secretary of the State of Illinois.

Since the work of the Moorish Science Temple of America was largely religious, the organization was legally changed to a religious organization on July 20th, 1928. An Affidavit to this effect has been properly filed in the Cook County Recorder's office of Illinois [Affidavit #10105905].

The Moorish Science Temple of America, Reincarnate Temple System, is the original Moorish Science Temple, deriving Supreme Power and Authority From the Prophet and Chief Magistrate Noble Drew Ali, Certificate #10580, Conferred; Nov.29, 1926, 1927, 1928, Chicago, Illinois. Illinois Tax Exemption -- E 9939-0647-01; IRS: Exeception # 17053-290-74400-4; Moorish Science Temple; EIN #56-2473981. Louisiana Treaty of 1803 [8 Stat. 200, Article III] -- NORTH AMERICAN CONFEDERATION OF MOURS UNITED UNDER THE LAND GRANT -- Spanish Certificate; June 20, 1797 [Plan No. 1518, Register No. 3, April 12, 1802 U.S. Land Grant No. 923]. [refer to U.S. Constitution, Article IV, Section. 1].

[3 of 5]

## ARTICLE V

### STRUCTURE:

Yielding explicitly to Divine Law. It is by the word of God-Allah thru His true and Divine Prophet, Noble Drew Ali, Mohammed III, that His laws be strictly preserved by all members of all the Temples of the Moorish Science Temple of America. [MHK - Ch. XLVII, #13]. Act. #6, of our Divine Constitution and By-Laws mandate: "...We are teaching our people their nationality and their Divine Creed..."

The Reincarnate Temple, is a Temple, the original Moorish Science Temple of America, in absolute obedience to the purpose for which the Moorish Science Temple of America, is founded... "To uplift fallen humanity." In the promotion and fulfillment of the great purpose of the Moorish Divine National Movement, it is imperative "Two eminent elements" are established --

[1]  An Independent Nation with a functioning government, and;
[2]  A Home of Worship.

With us, the Eminent elements are established in the names of:

[1]  "Empire Washitaw de Dugdyahmoundyah -- Washitaw Nation of Muurs/Moors; and,
[2]  The Moorish Science Temple of America, Reincarnate Temple System -- Ismaili Islam.

The Moorish Science Temple of America, Reincarnate Temple is the "religious" component of the Washitaw Nation of Muurs. The two are United in One. Embodied in a Monarchy Structure under the Divine Principles: Love, Truth, Peace, Freedom and Justice.

## ARTICLE VI

### REPRESENTATIVES:

[1]  Brother Ravanna Sanders-Bey, is the Supreme Grand Sheik/Imam -- National Leader for the Moorish Science Temple of America, Reincarnate Temple System; and Permanent Representative, Ambassador-At-Large for the Washitaw Nation of Muurs.

[2]  Brother El Seti Anu Ali El, is the Supreme Grand Mufti/Khan -- National protector for the Moorish Science Temple of America, Reincarnate Temple System; and the Empire Washitaw de Dugdyahmoundyah -- Washitaw Nation of Muurs.

[3]  Brother Claudis McClinton El, is the Mid-West Regional Grand Sheik/Imam for the Moorish Science Temple of America, Reincarnate Temple System.

[4]  By National Appointment, Brother Rickey Robinson-El, is a Sheik in Illinois vested with Primary Authority inclusive to Illinois geographical area at Stateville Correctional Center, along with Brother Jason Taylor-El.

There are Several Sheiks and Grand Sheiks in Illinois. The Illinois Grand Sheiks, is Appointed as MANAGING TRUSTEE OF THE illinois TEMPLE (Reincarnate Temple of Illinois).

Each of the Local (City & or Facility) Temple's throughout Illinois is headed by a "TEACHER" for the guidance of Our Local Temple membership.

Currently, We have many followers located at facilities throughout the State.

I, now conclude, and Pray all necessary requirements for "Recognition" are fulfilled. Peace!

Respectfully,

Brother Rickey Robinson-El
c/o #K82958 B-227

Service via U.S.P.S. operating within Washitaw de Dugdyahmoundyah
Registered Return Receipt

No. 7005 - 3110 - 0002 - 7556 - 2495

From: Rickey Robinson-El
     Resident #K82958
     Stateville Correctional Center
     C/O: P. O. Box 112
     Joliet, Illinois Republic
     Via: u.s.a. Postal Zone 60434
     Empire Washitaw Dugdyahmoundyah

To: Terry L. McCann, Warden
     Stateville Correctional Center
     C/O: P.O. Box 112
     Joliet, Illinois Republic
     Via: u.s.a. Postal Zone 60434
     Empire Washitaw de Dugdyahmondyah

CC: R.Robinson-El, Petitioner
    T.McCann, Warden
    G.Adamson, Chaplain

(Note: As I, Rickey Robinson-El, wish to Exhaust my Private Administrative Remedy and dispose of this matter as soon as possible, by having your response to either deny or accept the above REQUEST, it is imperative that I have your response within ten (10) days from the postmark of this REQUEST. Should you fail to respond you will have established the fact that you DISHONOR the REQUEST and therefore in Default upon your silence, with the opportunity to cure your fault. Thank you for your prompt attention to this matter.

                                      Sincerely,

Without Prejudice

_Rickey Robinson - El_
..............Secured Party Creditor
Pursuant to UCC 1-103.6 & 1-207

[5 of 5]

(Exhibit 6-3)

1) Written verification that other committed persons belong to that faith and are interested in attending such religious activities.

2) The names, addresses, and telephone numbers of the outside leaders of the faith

3) Copies of the by-laws, chapters, or articles of incorporation, to the extent available

4) Written verification of the religion's practices, requirements, historical origins, size of membership population, organization hierarchy and structure, role of religious personnel, dietary restrictions

5) The time, place, and nature of any religious activities to be conducted and the identity of the religious program volunteer who will conduct the requested religious activities as well as their address, telephone number, and credentials; and

o) The documentation required under Section 425.60

Chaplain Adamson states: "As the facility chaplain and member of the Religious Practice Advisory Board, do hereby request the above."

ILLINOIS DEPARTMENT OF CORRECTIONS

**RESPONSE TO COMMITTED PERSON'S GRIEVANCE**

### Grievance Officer's Report

**Date Received:** August 8, 2007 _____ **Date of Review:** August 8, 2007 ____

**Committed Person:** Ricky Robinson _____

**Grievance #** (optional): _____

**ID#:** K82058 _____

**Nature of Grievance:** Other-Religious: Indigenous Discrimination

**Facts Reviewed:** Grievant alleges that he and other inmates are members of Washitaw Nation Of Muurs and there is currently no allowance for them to practice their religion. Grievant states when a forum is not open to a particular group of inmates then the IDOC administrative process is malfunctioning.

Counselor Response: (CONDENSED) On 8-2-07, Chaplain Adamson responded to this grievance by reiterating the AD-C committed persons requesting religious activities not currently offered by the Department shall submit a written request to the facility Chaplain and submit all pertinent information pertaining to the religion (as stated in counselor's response attached to grievance).

Upon further review from Grievance Office, finds that this office concurs with the counselors response and adds that in reading the synopsis by grievant of the pertinent information needed for submitting the written request, noticed that there were no resources included (copies of the material also help) as to where the grievant received the information (what books or documents used to verify the faith). This office also noticed there was no included phone numbers and addresses of outside leaders of the faith which would be pertinent for finding out more information and for Chaplain to ask questions. It would behoove the grievant to make sure the information is complete and to supply the resources to the Chaplain.

**Recommendation:** Grievance is resolved.

Ami Workman _____
Print Grievance Officer's Name

_____ _____
Grievance Officer's Signature

(Attach a copy of Committed Person's Grievance, including counselor's response if applicable)

---

### Chief Administrative Officer's Response

**Date Received** 8-13-07

☑ I concur   ☐ I do not concur   ☐ Remand

**Comments**

_____   8-13-07
Chief Administrative Officer's Signature   Date

---

### Committed Person's Appeal To The Director

I am appealing the Chief Administrative Officer's decision to the Director. I understand this appeal must be submitted within 30 days after the date of the Chief Administrative Officer's decision to the Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277. (Attach a complete copy of the original grievance, including the counselor's response, if applicable, and any pertinent documents.)

_____   _____   _____
Committed Person's Signature   ID#   Date

**COMMITTED PERSON'S GRIEVANCE**

Date: 18 August 2006    Committed Person: Rickey Robinson-El

Present Facility: Stateville Correctional Center

Facility where grievance issue occurred: Stateville Correctional

**NATURE OF GRIEVANCE:**

☐ Personal Property          ☐ Mail Handling          ☐ Restoration of Good Time          ☐ Disability
☐ Staff Conduct             ☐ Dietary                ☐ Medical Treatment              ☒ Other: Violation of rights.
☐ Transfer Denial by Facility  ☐ Transfer Denial by Transfer Coordinator

☐ Disciplinary Report _____ Date of Report _____ Facility where issued _____

**Note** — Protective Custody Denials may be grieved immediately via the local administration or the protective custody status notification

Complete: Attach a copy of any pertinent document (such as a Disciplinary Report, Shakedown Record, etc.) and send to:

**Counselor**, unless the issue involves discipline, is deemed an emergency, or is subject to direct review by the Administrative Review Board.
**Grievance Officer**, only if the issue involves discipline at the present facility or issue not resolved by Counselor.
**Chief Administrative Officer**, only if EMERGENCY grievance.
**Administrative Review Board**, only if the issue involves transfer denial by the Transfer Coordinator, protective custody, involuntary administration of psychotropic drugs, issues from another facility except personal property issues, or issues not resolved by the Chief Administrative Officer.

Brief Summary of Grievance: I Rickey Robinson-El, declare that I am a free and sovereign

individual of this land of the ancient mound builders, known by its ancient

indigenous name Empire Washitaw de Dugdyahmoundyah. I willingly and knowingly

exersise my right to a nationality as a member of the indigenous Emperial

Washitaw Nation, Washitaw de Dugdyahmoundyah. I further reserve all of the

fundamental freedoms and God-given rights of every real live human being

upon this earth. Any and all, past and present, political affiliations implied

by operation of law or otherwise with foreign entities are hereby, now and

forever, dissolved and revoked.

One of the requirements needed for recording with the Washitaw Nation of

Relief Requested: That I be permitted to have my photo taken with my fez (sacred

headdress) on to complete my enrollment.

☐ Check only if this is an EMERGENCY grievance due to a substantial risk of imminent personal injury or other serious or irreparable harm to self.

_____          _____          _____
Committed Person's Signature        Date            Date

(Continue on reverse side if necessary)

---

### Counselor's Response (if applicable)

Date Received: 8 / 31 / 06    ☐ Send directly to Grievance Officer    ☐ Outside jurisdiction of this facility. Send to Administrative Review Board, P.O. Box 19277, Springfield, IL 62794-9277.

**Response:** IDOC Legal Counsel Jane Dilorio states that it is in her experience IDOC does
not have to take any photo nor have to facilitate arrangements for this inmate to obtain
any photo of him on the fez nor any photo in any medical fashion. As an inmate with
a life sentence, he has no need for a passport since he is not legitimately able to travel.
He has no personal or company, any business and correspondingly no need for any
employer identification number. Finally, since IDOC does not allow an inmate to act in an
authority position, including as a leader or any member or trustee of a religious organization,
there is no need to facilitate his recording nor document for such purposes.

L. Dennis                    _____          11-6-06
Print Counselor's Name        Counselor's Signature            Date of Response

---

### EMERGENCY REVIEW

Date Received: _____    Is this determined to be of an emergency nature?
☐ Yes, expedite emergency grievance.
☐ No, an emergency is not substantiated. Committed person should submit this grievance in the normal manner.

_____          _____
Chief Administrative Officer's Signature    Date

Muurs[Division of Enrollment and Nationalization] is:

A passport type photograph with "white" back-drop, upper shoulder and head with "red" Fez.

This can be easily obtained by way of computer shall this institution take my photo with my Fez on.

Moors are recognized by the Fez & Turban! To complete my Declaration on the National level a photo with me wearing my Fez is required (see the attached instruments front & back). For this institution to reject the wearing of my sacred headgear on the photo in it's system violates my religious first Amendment rights as well as hinders/violates my right to a Nationality, According to the United Nations Declaration on the Rights of Indigenous Peoples, Sub-Commission on the Promotion and Protection of Human Rights Resolution 1994/45:

Part I, Article 5 Every indigenous individual has the right to a Nationality.

Part VII, Article 32 indigenous individuals have the collective right to determine their own citizenship in accordance with their customs and traditions. Indigenous citizenship does not impair the right of indigenous individuals to obtain citizenship of the States [Republics] in which they live.

Part VIII, Article 37 States shall take effective and appropiate measures in consultation with the indigenous peoples concerned, to give full effect to the provisions of this Declaration. The rights herein shall be adopted and included in national legislation in such manner that indigenous people can avail themselves of such rights in practice.

NOTICE TO AGENT IS NOTICE TO PRINCIPLE, NOTICE TO PRINCIPLE IS NOTICE TO AGENT

D-1
Cont.

Exhibit D







The headgear worn in the photographs, the **Turban** and the **Fez**, are the official headdress of the Muurs of the Americas. They are the traditional headdress worn by holy men and women of Moorish descent. The white **Turban and Fez** are worn by Indigenous Peoples of the **Washitaw Nation of Muurs,** but were made red because of the blood lost during the **French and Indian Wars,** while defending the Washitaw Crown against European colonizers. The **Turban or Fez,** crimson in color, signifies the rank of **Sheikees** or **Sheik.** These headdresses are symbols of land aristocracy indicating allodial land ownership via the **Imperial Crown of Washitaw** [U.S. Land Grant No.: 923-1802/U.N. I.O.P. No.: 215/93]

The **Turban** and **Fez** are the most ancient and sacred of all headdress, signifying a gesture of respect to **Allah,** the Creator of the Universe. The sacred headdresses are worn by pious Muurs who acknowledge **Allah's** constant presence in life and death. They are the **"Righteous Ones"** [Hebrew: **Zaldikim**]. Worn by **Amurru** of ancient times, the **Turban and Fez** were extremely popular during the reign of **Moulay Idriss,** Sultan of the **Moorish Empire** [Spain and Northwest Africa]. The **Fez** had been so popular in the **Moroccan** city of **Fez,** that city became the **Capital City** of the **Moorish Empire** in 808 AD. The **Fez** is the warrior-scholar **Crown** of the **Amurru,** the Muurs of **Phoenicia** and **Carthage.**

El-Seti Anu Ali-El

Page 1 of 2

Ravanna Sanders Bey





The headgear worn in the photographs, the **Turban** and the **Fez**, are the official headdress of the Muurs of the Americas. They are the traditional headdress worn by holy men and women of Moori descent. The white **Turban** and **Fez** are worn by Indigenous Peoples of the **Washitaw Nation of Muu Washitaw Crown** against European colonizers. The **Turban** or **Fez**, crimson in color, signifies the rank of **Sheikees** or **Sheik**. These headdresses are symbols of land aristocracy indicating allodial land ownership via the **Imperial Crown of Washitaw** [U.S. Land Grant No.: 923-1802/U.N. I.O.P. No.: 215/93]

The **Turban** and **Fez** are the most ancient and sacred of all headdress, signifying a gesture of respect to **Allah**, the Creator of the Universe. The sacred headdresses are worn by pious Muurs who acknowledge **Allah's** constant presence in life and death. They are the **"Righteous Ones"** [Hebrew **Zaldikim**]. Worn by **Amurru** of ancient times, the **Turban** and **Fez** were extremely popular during the reign of **Moulay Idriss**, Sultan of the **Moorish Empire** [Spain and Northwest Africa]. The **Fez** had been so popular in the **Moroccan** city of **Fez**, that city became the **Capital City** of the **Moorish Empire** in 808 AD. The **Fez** is the warrior-scholar **Crown** of the **Amurru**, the **Muurs** of **Phoenicia** and **Carthage.**

El-Seri Ami Ali-El

Ravanna Sanders Bey

Page 1 of 2

Exhibit D-2



Brother El Seti Anu Ali El, liason to the Empress
Attorney General and Counsel General-at-Large
Supreme Grand Mufti/Khan, International
New Orleans, Louisiana Republic, Washitaw



Brother Arno Sutton Bey
Probation Status
Acting Local Shiek
Marensico, Michigan



Brother Richard Dyer Bey
Michigan Grand Mufti/Khan
Michigan Jurisdiction
Muskegon Heights, Mich.



Brother Omar Sanders II
Illinois Grand Mufti/Khan
Illinois State Jurisdiction





Brother Ravanna Sanders Bey
Secretary General, Ambassador
Supreme Grand Sheik, Int'l
New Orleans, Louisiana

Brother Derrick Cabbil Dey
Michigan Grand Sheik/Imam
Michigan Jurisdiction
Carson City, Michigan

Brother Claudis Adel M. El
Second Grand Sheik/Imam
Mid-West Region Jurisdiction
Chicago, Illinois



Brother Hakare Dwight Bey
Illinois Grand Sheik/Imam
Illinois Region Jurisdiction
Chicago, Illinois

Chicago, Second Region



2 of 2

D-7
Cont



Brother El Seti Anu Ali El, liaison to the Empress
Attorney General and Counsel General-at-Large
Supreme Grand Mufti/Khan, International
New Orleans, Louisiana Republic,  Washitaw

Brother Arno Sutton Bey
Probation Status
Acting Local Sheik
Marensico, Michigan

Brother Omar Sanders Bey
Illinois Grand Mufti/Khan
Illinois State Jurisdiction






Brother Richard Dyer Bey
Michigan Grand Mufti/Khan
Michigan Jurisdiction
Muskegon Heights, Mich.

Brother Claudis Adel M. El
Second Grand Sheik/Imam
Mid-West Region Jurisdiction
Chicago, Illinois





Page 2 of 2

Brother Ravanna Sanders Bey
Secretary General, Ambassador, Int'L
Supreme Grand Sheik, Int'L
New Orleans, Louisiana

Brother Derrick Cabbil Bey
Michigan Grand Sheik/Imam
Michigan Jurisdiction
Carson City, Michigan

Brother Bakare Dwight Bey
Illinois Grand Sheik/Imam
Illinois Region Jurisdiction
Chicago, Illinois

Chicago, Second Region









**Ⓒ** **Exhibit D-3**

Salvation

**Moorish Science Temple of America**
PROPHET NOBLE DREW ALI



Unity

**ISLAM  Amurru !**                                                        **HOTEP  Amu !**

The  following  Instructions  are  for  **Washitaw Muurs**  and  are  needed  for  recording  with

the  **Washitaw Nation of Muurs**  [Division  of  Enrollment  and  Nationalization].

1.  "Passport"  (type)  **PHOTOGRAPH**  with  "white"  back-drop:  Upper  shoulder  and  head
    with  "**red**"  Fez  (Only)  [Sisters:  with  "**red**"  Turban  (Only)].

2.  The  actual  document  (Copy):
    Financial  Statement —1  on  file  and  returned  (to  you)  with  "number"  affixed.
    Two-Page  Document

3.  The  actual  document  (Copy):
    Illinois  Department  of  State  "Secured  Party"  Letter  received  with  "number"  affixed.
    Two-Page  Document

4.  The  actual  document  (Copy):
    EIN  Letter  received  with  number  affixed.

5.  **General Identification Information**                 B.  **Name** [Washitaw Muur Name (Bey/El)]
    **A.  Home Location** (Address)                         Resident (or Apt.) **Number 000000**
                                                            **Mailing Location**
        Street Number                                          Street Address/P.O. Box Number
        City, State Republic                                   City, State Republic (Washitaw)
        [Via: u.s.A. postal zone 00000-0000]                   [Via: u.s.A. postal zone 00000-0000]
    **C.  Live Birth** (D.O.B. 00-month-year)              **D.  SSN** [Copy of Document (front & rear)]
        State of Birth                                     **E.  Passport Number** (Copy of Document)
        County of Birth                                        [Or, U.S. State Dept. Registration Number]
        Height  0' 0"                                      **F.  State, Drivers License or, ID Number**
        Weight  000 lb                                     **G.  State & original County Birth Certificates**

**Indigenous Washitaw Moorish American:  U.S. 923/1802  &  U.N. IPO 215/93**
**U.S.  NON-CITIZEN AMERICAN NATIONAL AND NON-RESIDENT ALIEN**
**UNITED STATES LAWS AFFIRMING   RIGHT TO CITIZENSHIP AND NATIONALITY**

15  Stat.  223-224  (1868),  R.S.  §  1999,  8  U.S.C.  §  800  (1940);  **United  States  v  Cruikshank,**  92  U.S.  542  (1875).
**American/U.S.A.  National**  54  Stat.  1137,  Section  101(a)(3)&(38),  Section  101(a)(21)-(22).  [PL  94-241;  90  Stat.  263,  at
Section  3;  100  Stat.  843,  August  27,  1986].  **The  Nationality  Act  of  1940,**  8  U.S.C.  Section  1101(21):  [**U.S.  Non-Citizen**]
8  U.S.C.  1452(b)(1)(2)  &  8  U.S.C.  1502(a),  Section  1452(a)(b)&(c);  Section  99-396,  16(c).   26  C.F.R.  §  7701(11),  39  F.R.52
(March  14,  1974);  26  C.F.R.  §  301.6109(a);  26  U.S.C.  §  3402  (n) – 1,  26  C.F.R.  §  31.3402(n)-1,  26  C.F.R.  §  3402(f)(2)-1,
26  C.F.R.  §  1.  1441–3.  [**Non-Resident  Alien**]  **[8  Stat.  200,  Article  III  (1803)]**  Empire  Washitaw  de  Dugdyahmoundyah

**Illinois Tax Exemption  E 9939–0647–01**                  **Moorish Science Temple of America EIN 56 – 2473981**
**IRS: Exception**                                          **In-Care-Of:  Washitaw Nation of Muurs**
                                                            **P.O. Box 0318, Chicago, Illinois [60621-0318]**

LOVE ——— TRUTH ——— PEACE ——— FREEDOM ——— JUSTICE

**EMPIRE WASHITAW de DUGDAHMOUNDYAH**
**Washitaw Empress, Verdiacee Tiari Washitaw-Tunica Goston El-Bey**

DO NOT COPY This Side

